359 S.E.2d 571

**Cassandra HAIRSTON**

v.

**Regina LIPSCOMB, in her own right, and as Commissioner of the West Virginia Department of Human Services; Sandra K. Gilmore, in her own right and as Assistant Commissioner (Director of the Child Advocate Office) of WVDHS; John McClusky, in his own right, and as Commissioner of the West Virginia Department of Finance and Administration; Glen B. Gainer, Jr., in his own right, and as Auditor of the State of West Virginia; and A. James Manchin, in his own right and as Treasurer of the State of West Virginia.**

No. 17629.

Supreme Court of Appeals
of West Virginia.

July 15, 1987.

David B. McMahon, Bruce G. Perrone, Legal Aid Soc. of Charleston, Charleston, for appellant.

NEELY, Justice:

Cassandra Hairston is the mother of three young children. She is not employed and has no income for herself or her children independent of the child support payments at issue in this case. Ms. Hairston was divorced from the father of her three children in 1981. The divorce order provided child support of $375 per month ($125 per child) and alimony of $25 per month for a total court ordered support payment of $400 per month.

For most of the period from 1981 through 1986 the children's father failed to pay child support. Due to the father's absence and refusal to support the children, Ms. Hairston received $312 per month of cash assistance, food stamps and Medicaid coverage from the Department of Human Services (WVDHS) from November 1986 through March 1987.

Pursuant to an assignment from Cassandra Hairston to WVDHS of rights to collect child support, WVDHS collected child support payments from the father by obtaining money withheld from the father's wages. For each month from November 1986 through April 1987, Ms. Hairston received the $50 "pass through" mandated by *W.Va.Code*, 48A–2–12(a)(1) [1986].[1] At the same time, WVDHS retained a portion of the child support collected each month equal to the amount of the AFDC cash assistance paid to Ms. Hairston in that month.[2] Ms. Hairston also received a por-

---

1. *W.Va.Code,* 48A–2–12(a)(1) [1986] provides:

   "The first fifty dollars of such amounts as are collected periodically which represent monthly payments shall be paid to the obligee without affecting the eligibility of such person's family for assistance from the Department of Human Services or decreasing any such amount otherwise payable as assistance to such family."

2. *W.Va.Code,* 48A–2–12(a)(2) [1986] provides:

   "Such amounts as are collected periodically which are in excess of any amount paid to the family under subdivision (1) of this subsection and which represent monthly support payments shall be paid by the office of the appropriate administrative unit of the department of human services to reimburse it for assistance payments to the family during such period (with appropriate reimbursement of the federal government to the extent of its participation in the financing.)"

tion of the child support collected each month equal to the amount by which court ordered child support exceeded the AFDC cash assistance grant in that month.[3] Finally, the WVDHS retained all child support collected above the court-ordered support amount for Ms. Hairston as reimbursement for past AFDC cash assistance paid to the Hairston family [4].

On 16 March 1987 WVDHS notified Ms. Hairston that her family's AFDC cash assistance benefits would be terminated in April because child support was being collected in excess of the AFDC grant. Ms. Hairston was allegedly told by her case worker that she would continue to receive food stamps and that she would continue to have Medicaid coverage. Then, on 18 March 1987 WVDHS notified Ms. Hairston that her eligibility for food stamps would be terminated unless she verified the amount of child support collected by WVDHS from the children's father. In response to this notice, Ms. Hairston explained to her case worker that she did not know how much child support had been collected by WVDHS because the payments went directly to WVDHS and not to Ms. Hairston. She was allegedly told by her economic services worker that he would obtain the necessary information from the child support worker, and her food stamp eligibility and Medicaid eligibility would be continued.

However, in April 1987 Ms. Hairston did not receive either food stamps or her Medicaid card. When she called WVDHS to inquire, she was told that her food stamp case had been closed for her failure to verify the amount of child support collected by WVDHS. Ms. Hairston was given no notice of the decision to terminate her food stamp eligibility, and was given no opportunity to contest that decision.

On 10 April 1987 WVDHS received a payment of $260.50 as child support from the father of Ms. Hairston's children. Ms. Hairston did not receive any portion of this child support collected by the WVDHS in April although more than ten days had elapsed since WVDHS received the child support payment.[5] Ms. Hairston's only income in April 1987 was the $50.00 "disregard" paid from the child support payments collected in March of 1987 and $76.00 of child support paid by the father in December 1986 and March 1987. The Hairston family could not meet their basic expenses for food, rent, utility bills, etc. In addition, one of Mrs. Hairston's sons went to the hospital or doctor's office five times in April 1987.

Ms. Hairston began this action to collect AFDC moneys, food stamps and Medicaid coverage that had been wrongfully terminated by the WVDHS. She also wanted timely disbursement to her of the child support payments collected by the WVDHS on her behalf as required by *W. Va. Code,* 48A–2–12(a) [1986]. After the filing of this action, Ms. Hairston had her child support benefits and food stamps reinstated and the problems peculiar to Ms. Hairston's case have been resolved. Thus, respondents raise the issue of mootness. However, the problem of late payments *per se* by the WVDHS is an issue to be addressed because without court relief the problems of near starvation and financial desperation that Ms. Hairston has encountered are likely to recur.

3. *W. Va. Code,* 48A–2–12(a)(3) [1986] provides:

"Such amounts as are in excess of amounts required to reimburse the department of human services under subdivision (2) of this subsection and are not in excess of the amount required to be paid during such period to the family by a court order shall be paid to the obligee."

4. *W. Va. Code,* 48A–2–12(b)(1)(A) [1986] provides:

WVDHS shall "continue to collect amounts of support payments which represent monthly support payments from the obligor for a period of not to exceed three months from the month following the month in which such family ceased to receive assistance from the department of human services and pay all amounts so collected, which represent monthly support payments, to the obligee."

5. *W. Va. Code* 48A–2–12(a) [1986] provides:

"Amounts collected as child or spousal support by the office shall be distributed within ten days of receipt, except as otherwise specifically provided in this chapter."

## I

In *State ex rel. M.C.H. v. Kinder*, 173 W.Va. 387, 317 S.E.2d 150 (1983), we held that a case will not be rendered moot if "such issues are capable of repetition and yet will evade review." We outlined three considerations in *Kinder* for determining exceptions to the mootness doctrine: (1) Whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; (2) whether questions of great public interest should be addressed for the future guidance of the bar or the public; and (3) whether the issues may be repeatedly presented yet escape review because of their fleeting nature. Clearly, Ms. Hairston's situation meets all three *Kinder* criteria.

Similar delays in future payments may occur over and over again for Ms. Hairston, or for any other obligee entitled to disbursement of child support within ten days of receipt by WVDHS. Recognition of the multitude of other obligees entitled to disbursement within ten days of receipt meets the second *Kinder* consideration and Ms. Hairston's original problem should be addressed to provide future guidance for public officials. Guidance on this question serves the public interest by assuring that funds paid for child support are directed to the children who need them in accordance with the time limits prescribed by the legislature. By the very nature of the short (ten day) limitation in question, the issue may repeatedly be presented yet escape review when late payment is made. The U.S. Supreme Court has phrased this condition as "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Gannett Co. v. De Pasquale*, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) *quoting from Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975).

6. *W.Va.Code*, 12–2–2 [1983] provides, in pertinent part, as follows:

## II

*W.Va.Code*, 48A–2–1 [1986] establishes the Child Advocate Office, which is an internal division of the Department of Human Services. The Child Advocate Office is charged by *W.Va.Code*, 48A–2–13 [1986] with receiving payments of support issued to an obligee who applies for or receives services of the Child Advocate Office as well as with receiving payments of support from an obligor who requests that support payments be made to the Child Advocate Office. The Child Advocate Office is charged by *W.Va.Code*, 48A–2–12(a) [1986] with distributing sums collected either as child or spousal support within ten days of receipt, except as otherwise provided under *W.Va.Code*, 48A–2–12(a) [1986].

Upon receipt of payments of child or spousal support, the Child Advocate Office, through the WVDHS, deposits money received with the State Treasury under the system described in *W.Va.Code*, 12–2–2 [1983]. The WVDHS then requests that a payment be made through the State Department of Finance and Administration, the Office of the Auditor, and the State Treasurer. This process requires 2–3 business days. If a weekend falls during this process the time lengthens to 4–5 days. Although the Treasurer performs the acts required of him in four hours and no later than one working day, much time is wasted by delivery of paperwork from office to office. After all offices have performed their functions, the completed warrants are picked up by the Department of Human services for distribution. The Hairston family is a victim of this waste of time in delivering child support payments. Therefore, a new system of payment, if permitted by law, is obviously in order.

*W.Va.Code*, 12–2–2 [1983], which establishes the standard procedure for handling state money, speaks clearly and plainly of moneys due the State of West Virginia. *W.Va.Code*, 48–A–2–13 [1986], however, speaks clearly of moneys due for payment of support.[6] The obligee under *W.Va.*

"All officials and employees of the State authorized by statute to accept moneys due the State of West Virginia shall keep a daily item-

*Code*, 48A–2–13 [1986] is not the State of West Virginia, the Child Advocate Office, the WVDHS or any branch of state government. The obligee is the person entitled to receive the support as defined under *W.Va. Code*, 48A–2–2(b) [1986] and *W.Va.Code*, 48A–2–2(b)(3) [1986].

We first addressed the issue of defining which sources of state dollars should be deposited in the State Treasury in compliance with *W.Va.Code*, 12–2–2 [1983] in *State ex rel. Kelly v. Moore*, 156 W.Va. 780, 197 S.E.2d 106 (1973), *appeal dismissed*, 414 U.S. 1118, 94 S.Ct. 853, 38 L.Ed.2d 746 (1974). There we held for the State Treasurer in his mandamus action to require the Governor to transfer federal revenue-sharing funds to the custody of the State Treasurer. At issue in *Kelly* were dollars received by the Governor's office to be transmitted to the cities and counties for *general revenue*. Similarly, we held in *Morgantown v. Ducker*, 153 W.Va. 121, 168 S.E.2d 298 (1969), that moneys received and administered by the West Virginia University board of governors are *public moneys* that must be paid into the State Treasury and withdrawn only upon proper warrant and check in accordance with *W.Va.Code*, 12–2–2 [1983]. Obviously, our prior holdings, if carried to their logical conclusion, could easily lead to a finding that support payments are "moneys due the State." However, no valid policy is served in so holding, and those cases do not *demand* such a finding. In the cases cited, the moneys in question were moneys received by the government for government purposes: in the case before us today the moneys are private moneys received by the government for dis-

bursement to private individuals for private purposes.

Courts have long recognized that they have a duty to construe statutes in a way that will accomplish the intent of the legislature. "If the literal meaning of a statute is inconsistent with the meaning or intent of the legislature, or would head to perverse results, the words of the statute must be interpreted to reflect the intention of the legislature." *Pryor v. Gainer*, 177 W.Va. 218, 351 S.E.2d 404, 408 (1986). *See generally* Sutherland Statutory Construction § 46.07 (4th ed. 1984). The inherent conflict created by the meshing of *W.Va. Code*, 48A–2–13 [1986] and *W.Va.Code*, 12–2–2 [1983] must have been unforeseen by the legislature.

"Where a special fund is created or set aside by statute for a particular purpose or use, it must be administered and expended in accordance with the statute, and may be applied only to the purpose for which it was created or set aside, and not diverted to any other purpose or transferred from such authorized fund to any other fund," Syllabus Point 7, *McGraw v. Hansbarger*, 171 W.Va. 758, 301 S.E.2d 848 (1983).[7] By using the State Treasury as a depository for funds collected under *W.Va.Code*, 48A–2–13 [1986] the WVDHS in effect diverts the funds from the needy spouse and children to the State Treasury. The money garnished from the husband's paycheck is channeled through the brontosaurus-like, combined bureaucracies of the Department of Human Services, Department of Finance and Administration, State Auditor, and State Treasury. However, private funds collected for private purposes need not be administered with the same checks and bal-

ized record of such moneys so received for deposit in the State treasury and shall deposit within twenty-four hours with the State Treasurer all moneys received or collected by them for or on behalf of the State for any purpose whatsoever."

*W.Va.Code*, 48A–2–13 [1986] states:
"All support payments owed to an obligee who is an applicant for or recipient of the services of the office shall be paid to the office. Any other obligee owed a duty of support under the terms of a support order entered by a court of competent jurisdiction may request that the support payments be

made to the office. In such case, the office shall proceed to receive and disburse such support payments to or on behalf of the obligee as provided by law."

7. This Court recognized this principal in *State ex rel. Cook v. Lawson*, 110 W.Va. 258, 157 S.E. 589 (1931). *See also, Thomas v. Board of Education of McDowell County*, 167 W.Va. 911, 280 S.E.2d 816, 820 (1981) ("When a levy election is held to raise money for a specific public purpose, the money must be applied toward that purpose.")

ances as public money because the obligee will quickly point out any irregularity. At some point theoretical protection of money in the hands of a public body must yield to considerations of the glacial pace of real world disbursement to the desperately needy.

The receipt of moneys due obligees are not moneys due the State of West Virginia. The Child Advocate Office acts in a fiduciary capacity as a collector and distributor of money due to spouses, former spouses and children. Therefore, the system mandated by *W.Va.Code*, 12–2–2 [1983] does not apply to these "pass through" payments. As the standard state disbursement system is not required with regard to these pass through payments by clear and unambiguous legislative language and causes a 2–5 day delay in distributing support payments, we see no need for it to continue. In fact, all parties who have appeared in this action, including the WVDHS, the State Treasurer, and the State Auditor agree that another system would be better if it is legal.

### III

The goal of the Legislature in enacting The Child Enforcement Chapter was to improve and *facilitate* child and spousal support enforcement efforts in this State. *W.Va.Code*, 48A–1–2 [1986]. The State Treasurer, the State Auditor and the WVDHS have all faithfully followed the formalities of our two state laws. Nonetheless, given the conflict between the two statutes and the practical difficulties of processing support money quickly through the State's financial departments, we can decide this case as the legislature would have if they had foreseen this problem when drafting the *W.Va.Code*, 48A–2–12 [1986]. This is an issue of mechanics and not philosophy. We hope that we are faithfully reconciling two conflicting statutes to achieve the intent of the legislature. If our result is wrong, the legislature can change it.

Thus, we hold that the Department of Human Services and Child Advocate Office must adopt an efficient, expeditious method to distribute support payments collected pursuant to *W.Va.Code*, 48A–2–12 [1986]; this fund is not subject to the requirements of *W.Va.Code*, 12–2–2 [1983] because its deposits are not money due the State, and proceeding by the requirements mandated by *W.Va.Code*, 12–2–2 [1983] makes it impossible to comply with the *W.Va.Code*, 48A–2–12 [1986] requirement that the money be paid within ten days. WVDHS may establish a checking account for the sole purpose of distributing support payments. This will save 2–5 days in processing and will serve to expedite payments to people who depend on them.

Writ as moulded awarded.