388 S.E.2d 480

**Erin ISRAEL, by her Next Friend, Patricia ISRAEL**

v.

**WEST VIRGINIA SECONDARY SCHOOLS ACTIVITIES COMMIS- SION and the Board of Education of Pleasants County.**

No. 18904.

Supreme Court of Appeals of West Virginia.

Dec. 20, 1989.

Christine M. Hedges, Hedges, Jones, Whittier & Hedges, Spencer, for Erin Israel.

Richard A. Hayhurst, Parkersburg, for Bd. of Educ. of County of Pleasants.

William R. Wooton, Wooton, Wooton & Fragile, Beckley, for W.Va. Secondary Schools Activities Com'n.

MILLER, Justice:

Erin Israel, by her next friend, Patricia Israel, appeals from a final order of the Circuit Court of Pleasants County, entered February 11, 1988, denying her request for a declaratory judgment, injunctive relief, and damages on the basis of alleged gen-

der discrimination. On appeal, Ms. Israel asserts that she was discriminated against in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and its state counterpart, Article III, Section 17 of the West Virginia Constitution, as well as the Human Rights Act, W.Va.Code, 5–11–1, *et seq.* (1987). We have reviewed the record and find reversible error; therefore, we reverse the judgment of the Circuit Court of Pleasants County and remand the case for further proceedings consistent with this opinion.

Ms. Israel has a great deal of experience playing baseball. She began playing baseball at the age of six in the local park and recreation league where she learned the basic fundamentals of the game. At the age of nine, Ms. Israel progressed into the Little League system. Her Little League coach testified that Ms. Israel's skills were always above average. He stated that "[s]he was very aggressive, understood the game, its concepts, and its technique." While playing Little League, Ms. Israel was nominated for every all-star team. At the age of thirteen, she became the first female to ever play on a Pony League team in Pleasants County. When Ms. Israel was a freshman at St. Marys High School, and expressed a desire to play on the all-male baseball team, the high school baseball coach told her he had no objections to her playing for him and promised to give her a fair tryout. In February, 1984, Ms. Israel tried out for the all-male high school base-

ball team. She was prohibited from playing on the team because of a regulation promulgated by the Secondary Schools Activities Commission (SSAC).

The Board of Education of the County of Pleasants (Board) is a member of the SSAC. The SSAC is a nonprofit organization created by W.Va.Code, 18–2–25 (1967), which authorizes county boards of education to delegate their supervisory authority over interscholastic athletic events and band activities to the SSAC.[1] It is not disputed that every county board of education in West Virginia has delegated this responsibility and authority to the SSAC. In the exercise of its delegated authority, the SSAC adopted Rule No. 3.9,[2] which provides:

"If a school maintains separate teams in the same or related sports (example: baseball or softball) for girls and boys during the school year, regardless of the sports season, girls may not participate on boys' teams and boys may not participate on girls' teams. However, should a school not maintain separate teams in the same or related sports for boys and girls, then boys and girls may participate on the same team except in contact sports such as football and wrestling."

Shortly after Ms. Israel tried out to play on the baseball team, she was informed by St. Marys' assistant principal that she was ineligible to play on the baseball team because St. Marys had a girls' softball team.[3]

---

1. W.Va.Code, 18–2–25, provides, in pertinent part:

"The county boards of education are hereby granted and shall exercise the control, supervision and regulation of all interscholastic athletic events, and other extracurricular activities of the students in public secondary schools, and of said schools of their respective counties. The county board of education may delegate such control, supervision and regulation of interscholastic athletic events and band activities to the 'West Virginia secondary schools activities commission,' which is hereby established.

"The West Virginia secondary schools activities commission shall be composed of the principals, or their representatives, of those secondary schools whose county boards of education have certified in writing to the state superintendent of schools that they have elect-

ed to delegate the control, supervision and regulation of their interscholastic athletic events and band activities of the students in the public secondary schools in their respective counties to said commission."

2. This rule was numbered 16–0–3 when this action was brought, but has since been renumbered.

3. Although Ms. Israel intimates in her brief that the girls' softball team was established in order to prevent her from trying out for the baseball team, the record indicates otherwise. In 1982, members of the student council at St. Marys requested that a girls' softball team and a girls' volleyball team be established at the school. After a survey showed sufficient interest in participation in these two sports, the principal of St. Marys asked the Board for permission to

The assistant principal explained that if the school allowed Ms. Israel to play baseball, it would be in violation of Rule 3.9 and would be barred from playing in state tournaments. After numerous futile efforts to have the rule changed through the internal mechanisms provided by the SSAC, Ms. Israel filed a complaint with the Human Rights Commission (Commission).

The Commission issued Ms. Israel a right-to-sue letter, and she filed this action against the SSAC and the Board on April 18, 1986, in the Circuit Court of Pleasants County. The circuit court exonerated the Board, finding that it had made a good-faith effort to have the SSAC change the rule and that if the Board had ignored Rule 3.9, it would have been subject to severe sanctions by the SSAC. Ms. Israel does not appeal this ruling. She does appeal the circuit court's decision that the SSAC rule was valid.

## I.

### MOOTNESS

■ Initially, the SSAC argues that because Ms. Israel has graduated from high school, her claims for injunctive and declaratory relief are now moot. " 'Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or of property, are not properly cognizable by a court.' " *State ex rel. West Virginia Secondary Schools Activities Comm'n v. Oakley,* 152 W.Va. 533, 537, 164 S.E.2d 775, 778 (1968), *quoting* Syllabus Point 1, *State ex rel. Lilly v. Carter,* 63 W.Va. 684, 60 S.E. 873 (1908).

However, we, along with most courts, have tempered the inflexibility of mootness jurisprudence in recent years. In *State ex rel. M.C.H. v. Kinder,* 173 W.Va. 387, 390, 317 S.E.2d 150, 153 (1984), we quoted and adopted from *State v. Gleason,* 404 A.2d 573, 578 (Me.1979), three factors to be considered in deciding whether to address technically moot issues:

organize girls' volleyball and softball teams. The Board approved, and the first softball sea-

" 'First, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief.... Second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public.... Third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided....' " (Citations omitted).

*See also Hairston v. Lipscomb,* 178 W.Va. 343, 359 S.E.2d 571 (1987); *Christie v. West Virginia Health Care Cost Review Auth.,* 176 W.Va. 420, 345 S.E.2d 22 (1986); *State ex rel. McGraw v. Willis,* 174 W.Va. 118, 323 S.E.2d 600 (1984); *Rissler v. Giardina,* 169 W.Va. 558, 289 S.E.2d 180 (1982). *See also In the Matter of Sedlacek v. South Dakota Teener Baseball Program,* 437 N.W.2d 866 (S.D.1989).

■ Application of these considerations to the instant matter counsels us not to dismiss this appeal as moot. First, we take note that West Virginia's climate and early-June graduation combine to make the spring high school baseball season a brief affair. It is quite unlikely, if not impossible, that a fully litigated case on this issue could reach us before becoming "moot." That the issue is capable of repetition is self-evident. Moreover, deciding the validity of SSAC Rule 3.9 will have sufficient collateral consequences that our decision on the issue will not be a vain exercise. Finally, this question "undisputably involves a most vital public function—education of our youth. Because it is foreseeable that it will arise again, we find the question remains justiciable for future guidance." *White by White v. Linkinoggor,* 176 W.Va. 410, 412, 344 S.E.2d 633, 635 (1986). (Citations omitted).

son was in 1984.

## II.

## EQUAL PROTECTION

■ Equal protection of the law is implicated when a classification treats similarly situated persons in a disadvantageous manner. *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225, 229 (1971). The claimed discrimination must be a product of state action[4] as distinguished from a purely private activity. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

### A.

### *Fourteenth Amendment Equal Protection*

In analyzing gender-based discrimination, the United States Supreme Court has been willing to take into account actual differences between the sexes, including physical ones. In *Michael M. v. Sonoma County, Superior Court,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437, 442 (1981), the Court explained that it has "consistently upheld statutes where the gender-based discrimination is not invidious but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." On the other hand, the court has disapproved classifications that reflect "archaic and overbroad generalizations." *Schlesinger v. Ballard,*

419 U.S. 498, 508, 95 S.Ct. 572, 577, 42 L.Ed.2d 610, 618 (1975).

■ Under the United States Constitution, a gender-based discrimination is subject to a level of scrutiny somewhere between the traditional equal protection analysis and the highest level of scrutiny utilized for suspect classes. The intermediate level of scrutiny as applied to gender-based discrimination was stated in *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397, 407 (1976): "[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to withstand an equal protection challenge.

Under the middle-tier analysis for gender-based discrimination claims, courts have recognized that it is constitutionally permissible under certain circumstances for public schools to maintain separate sports teams for males and females so long as they are substantially equivalent.[5] This result has been justified by one or more of the following reasons: (1) there are physical and psychological differences between males and females; (2) the maintenance of separate teams promotes athletic opportunities for women; and, as a corollary to (2), (3) if there were not separate teams, men might dominate in certain sports.[6] *E.g.,*

---

**4.** Every court that has considered the question whether associations like the SSAC are state actors have found that those organizations are so intertwined with the state that their acts constitute state action. *See, e.g., Clark v. Arizona Interscholastic Ass'n,* 695 F.2d 1126 (9th Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983); *Yellow Springs Exempted Village School Dist. Bd. of Educ. v. Ohio High School Athletic Ass'n,* 647 F.2d 651 (6th Cir.1981); *Brenden v. Independent School Dist. 742,* 477 F.2d 1292 (8th Cir.1973); *Mitchell v. Louisiana High School Athletic Ass'n,* 430 F.2d 1155 (5th Cir.1970); *Haas v. South Bend Community Center,* 259 Ind. 515, 289 N.E.2d 495 (1972); *B.C. v. Board of Educ., Cumberland Regional School Dist.,* 220 N.J.Super. 214, 531 A.2d 1059 (1987).

**5.** The most easily resolved gender discrimination sports violation under equal protection principles is in the area of noncontact sports where the school has a male team, but no female counterpart. Courts have held that pro-

hibiting a female from trying out for a male team violates equal protection principles. *E.g., Brenden v. Independent School Dist. 742, supra; Leffel v. Wisconsin Interscholastic Athletic Ass'n,* 444 F.Supp. 1117 (E.D.Wis.1978); *Hoover v. Meiklejohn,* 430 F.Supp. 164 (D.Colo.1977); *Haas v. South Bend Community School Corp., supra.*

**6.** Several courts have upheld rules which prohibit males from trying out for a sport which is provided exclusively for females. These decisions have found that this practice is a permissible means of attempting to promote equality of opportunity for females in interscholastic sports and of redressing past discrimination. *E.g., Clark v. Arizona Interscholastic Ass'n, supra; Petrie v. Illinois High School Athletic Ass'n,* 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979); *B.C. v. Board of Educ., Cumberland Regional School Dist., supra; Mularadelis v. Haldane Cent. School Bd.,* 74 A.D.2d 248, 427 N.Y.S.2d 458 (1980). *But see, Gomes v. Rhode Island Interscholastic League,* 469 F.Supp. 659

*O'Connor v. Board of Educ. of School Dist. No. 23,* 645 F.2d 578 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981); *Clark v. Arizona Interscholastic Athletic Ass'n,* 695 F.2d 1126 (9th Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983); *Lafler v. Athletic Bd. of Control,* 536 F.Supp. 104 (W.D.Mich.1982); *Hoover v. Meiklejohn,* 430 F.Supp. 164 (D.Colo.1977); *Carnes v. Tennessee Secondary School Ass'n,* 415 F.Supp. 569 (E.D.Tenn.1976); *Ritacco v. Norwin School Dist.,* 361 F.Supp. 930 (W.D.Pa.1973); *Gilpin v. Kansas State High School Activities Ass'n, Inc.,* 377 F.Supp. 1233 (D.Kan.1973); *Bucha v. Illinois High School Ass'n,* 351 F.Supp. 69 (N.D.Ill.1972); *Haas v. South Bend Community School Corp.,* 259 Ind. 515, 289 N.E.2d 495 (1972). *Cf. Sullivan v. City of Cleveland Heights,* 869 F.2d 961 (6th Cir. 1989) (ten-year-old female hockey player was not denied equal protection because she was required to change clothes in a restroom which was substantially similar to the locker room utilized by the male hockey players).

While courts have recognized the concept of substantial equivalency in the area of interscholastic sports, this does not mean that mere superficial equivalency will be found constitutional under equal protection principles. We are not cited nor have we found a case precisely on point. Several courts have held that Little League baseball teams must, under equal protection principles, permit female players to try out. *E.g., Fortin v. Darlington Little League, Inc.,* 514 F.2d 344 (1st Cir.1975); *National Org. for Women v. Little League Baseball, Inc.,* 127 N.J.Super. 522, 318 A.2d 33, *aff'd mem.,* 67 N.J. 320, 338 A.2d 198 (1974). However, in these cases, there was not a comparable team for females.

■ From the record in this case, we find that the games of baseball and softball are not substantially equivalent. There is, of course, a superficial similarity between the games because both utilize a similar

format. However, when the rules are analyzed,[7] there is a substantial disparity in the equipment used and in the skill level required. The difference begins with the size of the ball and its delivery, and differences continue throughout. The softball is larger and must be thrown underhand, which forecloses the different types of pitching that can be accomplished in the overhand throw of a baseball.

There are ten players on the softball team and nine on a baseball team. The distance between the bases in softball is sixty feet, while in baseball it is ninety feet. The pitcher's mound is elevated in baseball and is not in softball. The distance from the pitcher's mound to home plate is sixty feet in baseball and only forty feet in softball. In baseball, a bat of forty-two inches is permitted, while in softball the maximum length is thirty-four inches.

Moreover, the skill level is much more demanding in baseball because the game is played at a more vigorous pace. There are more intangible rewards available if one can make the baseball team. For a skilled player, such as the record demonstrates Ms. Israel to be, it would be deeply frustrating to be told she could not tryout for the baseball team, not because she did not possess the necessary skills, but only because she was female. The entire thrust of the equal protection doctrine is to avoid this type of artificial distinction based solely on gender.

We agree with the SSAC that by providing a softball team for females, it was promoting more athletic opportunities for females. However, this purpose does not satisfy the equal protection mandate requiring substantial equivalency. We do not believe that by permitting females to try out for the boys' baseball team, a mass exodus from the girls' softball team will result. There are obvious practical considerations that will forestall such a result. Gender does not provide an automatic admission to play on a boys' baseball team.

(D.R.I.), *vacated as moot,* 604 F.2d 733 (1st Cir.1979).

7. The record contains copies of the SSAC's official rules books for baseball and women's softball.

The team is selected from those who apply and possess the requisite skill to make the team.[8] What we deal with in this case is an opportunity to have a chance to try out for the team. Aside from the baseball-softball dichotomy, other athletic events ordinarily operate on the same rules such that the substantial equivalency issue would be unlikely to arise.

## B.

### State Equal Protection

■ The argument is made that our gender-based equal protection standard is pegged at a higher level, i.e., the strict scrutiny standard, based on our holding in Syllabus Point 2 of *Peters v. Narick*, 165 W.Va. 622, 270 S.E.2d 760 (1980).[9] The issue in *Peters* involved a discriminatory statute that permitted wives, but not husbands to seek separate maintenance. W.Va.Code, 48–2–28 (1976).[10] We recognized in *Peters* the gender-based classification test adopted in *Craig v. Boren, supra*[11] and found that the maintenance statute violated the Equal Protection Clause of the Fourteenth Amendment.[12] By way of dictum, we then proceeded to discuss our state constitution's equal protection standard.

As a preliminary matter, we have recognized that although the phrase "equal protection" is not found in our constitution, its principles are an integral part of our constitutional law. *E.g., Robertson v. Goldman,* 179 W.Va. 453, 369 S.E.2d 888 (1988); *State ex rel. Longanacre v. Crabtree,* 177 W.Va. 132, 350 S.E.2d 760 (1986); *Peters v. Narick, supra; Thorne v. Roush,* 164 W.Va. 165, 261 S.E.2d 72 (1979); *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977); *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965); *Linger v. Jennings,* 143 W.Va. 57, 99 S.E.2d 740 (1957). Our cases have not been uniform as to where this principle reposes in our constitution. We have identified several constitutional provisions as providing the source of our equal protection doctrine.[13]

The same problem exists in the Fifth Amendment to the United States Constitution, which also lacks an "equal protection clause." When addressing actions of the federal government, the United States Supreme Court has traditionally found that the concept of equal protection is embodied in the Due Process Clause of the Fifth Amendment. As stated in note 2 of *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514, 519 (1975):

**8.** In *Croteau v. Fair,* 686 F.Supp. 552 (E.D.Va. 1988), the court rejected a sex discrimination claim by a female who had not made the boys' baseball team. She had tried out for the team, but had failed to make the "cut." The court found from the record that the "plaintiff received a fair tryout and that the decision to cut her was made in good faith and for reasons unrelated to gender." 686 F.Supp. at 554.

**9.** Syllabus Point 2 of *Peters* states:
"Gender-based classifications challenged as denying the right to equal protection guaranteed by Article III, Section 17 of the West Virginia Constitution are to be regarded as suspect, accorded the strictest possible judicial scrutiny, and are to be sustained only if the State can demonstrate a compelling interest to justify the classification."

**10.** In 1981, the legislature amended W.Va.Code, 48–2–28, to make it gender neutral. 1981 W.Va. Acts ch. 77.

**11.** *Peters* quoted this statement from *Craig v. Boren:* "To withstand scrutiny under the Equal Protection Clause 'classifications by gender

must serve important governmental objectives and must be substantially related to achievement of these objectives.' 429 U.S. at 197, 97 S.Ct. at 457, 50 L.Ed.2d at 407." 165 W.Va. at 626, 270 S.E.2d at 762.

**12.** Syllabus Point 1 of *Peters* states: "*W.Va.Code* 48–2–28 (1976) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by reason of the fact that it establishes a gender-based classification permitting wives but not husbands to seek separate maintenance."

**13.** *Robertson v. Goldman, supra* (art. III, § 10, due process clause); *State v. Memorial Gardens Dev. Corp.,* 143 W.Va. 182, 101 S.E.2d 425 (1957) (art. III, § 10, due process clause); *State ex rel. Longanacre v. Crabtree, supra* (art. VI, § 39, special laws prohibited); *Peters v. Narick, supra* (art. III, § 17, right to equal protection is guaranteed); *Linger v. Jennings, supra* (art. III, § 17, denial of justice and open courts).

"This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment. See, e.g., *Schlesinger v. Ballard,* 419 U.S. 498 [95 S.Ct. 572, 42 L.Ed.2d 610] (1975); *Jimenez v. Weinberger,* 417 U.S. 628, 637 [94 S.Ct. 2496, 2502, 41 L.Ed.2d 363] (1974); *Frontiero v. Richardson,* 411 U.S. 677 [93 S.Ct. 1764, 36 L.Ed.2d 583] (1973)."

*See also Schneider v. Rusk,* 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

In order to finally settle where our state's constitutional equal protection principle is located, we hold that it is a part of our Due Process Clause found in Article III, Section 10 of the West Virginia Constitution,[14] and, thus, we confirm Syllabus Point 3 of *Robertson v. Goldman, supra:*

"The concept of equal protection of the laws is inherent in article three, section ten of the West Virginia Constitution, and the scope and application of this protection is coextensive or broader than that of the fourteenth amendment to the United States Constitution."[15]

We explained in *State ex rel. Longanacre v. Crabtree,* 177 W.Va. at 135–136, 350 S.E.2d at 763–64, that "we have obtained guidance from federal cases interpreting the equal protection mandate of the Fourteenth Amendment to the United States Constitution[.]" In dicta in *Peters,* we strayed from this principle and ended by relying on cases involving "race, alienage [and] national origin." 165 W.Va. at 631, 270 S.E.2d at 765. (Footnote omitted). Classifications relating to race, alienage, or national origin have always been subject to strict judicial scrutiny, the most stringent test used in equal protection analysis. Another criticism leveled in *Peters* against the middle-tier gender standard for an equal protection analysis was that "we are unimpressed by the lineage of the middle-tier approach." 165 W.Va. at 630, 270 S.E.2d at 764. Whatever its lineage, it is clear almost ten years after *Peters* that the middle-tier standard is now firmly embedded in the federal law [16] and has been adopted by a number of state courts.[17]

■ For the foregoing reasons, we conclude that our dictum in *Peters* with regard to our state equal protection standard for gender-based discrimination should be modified. We adopt the analysis used by the United States Supreme Court and other state courts. We therefore hold that a gender-based classification challenged as denying equal protection under Article III, Section 10 of our constitution can be upheld only if the classification serves an important governmental objective and is substan-

---

**14.** Art. III, § 10 provides: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

**15.** Other state courts have also held that the concept of equal protection is found in their Due Process Clause. *E.g., Kinsey v. Preeson,* 746 P.2d 542 (Colo.1987); *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981).

**16.** *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Michael M. v. Sonoma County, Superior Court, supra; Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980); *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979).

**17.** *E.g., Hall v. McBride,* 416 So.2d 986 (Ala. 1982); *Plas v. State,* 598 P.2d 966 (Alaska 1979); *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005 (Colo.1982); *Dydyn v. Department of Liquor Control,* 12 Conn.App. 455, 531 A.2d 170, *appeal denied,* 205 Conn. 812, 532 A.2d 586 (1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988); *Long v. Department of Admin., Div. of Retirement,* 428 So.2d 688 (Fla. 1983); *State v. Rivera,* 62 Haw. 120, 612 P.2d 526 (1980); *State v. LaMere,* 103 Idaho 839, 655 P.2d 46 (1982); *Lovell v. Lovell,* 378 So.2d 418 (La.1979); *Callahan v. Department of Health & Mental Hygiene,* 69 Md.App. 316, 517 A.2d 781 (1986), *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987); *People v. Lewis,* 107 Mich.App. 277, 309 N.W.2d 234 (1981); *State v. Rundlett,* 391 A.2d 815 (Me.1978); *Oknefski v. Workers' Comp. Appeal Bd.,* 63 Pa.Commw. 450, 439 A.2d 846 (1981); *Waldeck v. Piner,* 488 A.2d 1218 (R.I. 1985); *Mitchell v. Mitchell,* 594 S.W.2d 699 (Tenn.1980); *Schilling v. Bedford County Memorial Hosp., Inc.,* 225 Va. 539, 303 S.E.2d 905 (1983).

tially related to the achievement of that objective. To the extent that Syllabus Point 2 of *Peters* differs from this rule, it is modified. It is apparent that the two tests are substantially equivalent. For this reason, we do not view the new gender-based equal protection rule to provide any less protection.

■ We have previously discussed in Section II(A), *supra,* the equal protection standard under the federal constitution and found the SSAC rule to be unconstitutional. For these same reasons, Rule 3.9 also violates our state equal protection constitutional standard.

## III.

## THE WEST VIRGINIA HUMAN RIGHTS ACT

### A.

### *"Place of Public Accommodations"*

The threshold question presented is whether the SSAC is a "place of public accommodations" under the Human Rights Act, W.Va.Code, 5–11–1, *et seq.,* and thereby subject to the provisions of W.Va.Code, 5–11–9(f)(1) (1987).[18] The phrase "place of public accommodations" is defined in W.Va.Code, 5–11–3(j):

"The term 'place of public accommodations' means any establishment or person, as defined herein, including the state, or any political or civil subdivision thereof, which offers its services, goods, facilities or accommodations to the general public, but shall not include any accommodations which are in their nature private[.]" [19]

The SSAC argues that it is not a "place of public accommodations" because participation in interscholastic athletics is not open to the general public, but rather is limited to secondary school students who meet certain age, residency, and academic requirements. We do not believe this statute is that narrowly confined.

We dealt with the public accommodations issue in *Shepherdstown Volunteer Fire Dep't v. West Virginia Human Rights Comm'n,* 172 W.Va. 627, 309 S.E.2d 342 (1983). There, two volunteer fire departments argued that they were not places of public accommodations and, therefore, did not have to admit women to membership. The fire departments contended that because our Human Rights Act is patterned after the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.,* as amended, this Court should follow the definition of "place of public accommodations" provided in the federal act.[20] We declined the volunteer fire departments' invitation for several reasons. First, we found our public accommodations definition to be broader than its federal counterpart. Second, we reiterated the liberal construction of the Human Rights Act which is required under its terms.[21] *See State Human Rights Comm'n v. Pauley,* 158 W.Va. 495, 212 S.E.2d 77 (1975), *disapproved on other*

---

**18.** W.Va.Code, 5–11–9, provides, in pertinent part:

"It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

＊　＊　＊　＊　＊　＊

"(f) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodations to:

"(1) Refuse, withhold from or deny to any individual because of his race, religion, color, national origin, ancestry, sex, age, blindness or handicap, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of such place of public accommodations[.]"

**19.** The SSAC undeniably falls within the definition of "person" which is found in W.Va.Code, 5–11–3(a), and provides: "The term 'person' means one or more individuals, partnerships, associations, organizations, corporations, labor organizations, cooperatives, legal representatives, trustees, trustees in bankruptcy, receivers and other organized groups of persons[.]"

**20.** 42 U.S.C. § 2000a provides that places of public accommodations are limited to places such as inns, hotels, motels, restaurants, theaters, and other such establishments.

**21.** W.Va.Code, 5–11–15, provides, in pertinent part, "[t]he provisions of this article shall be liberally construed to accomplish its objectives and purposes."

grounds, *State Human Rights Comm'n v. Pearlman Real Estate Agency,* 161 W.Va. 1, 239 S.E.2d 145 (1977). Accordingly, we held in Syllabus Point 1 of *Shepherdstown* that the fire departments were places of public accommodations.[22]

In reaching this conclusion in *Shepherdstown,* we identified two factors to determine whether an entity is a place of public accommodations: (1) if it is created and operated pursuant to the laws of the State of West Virginia, and (2) whether it receives funding from public sources. This definition is, of course, not exclusive. Certainly, as other courts have indicated, establishments receiving no public funds can also be places of public accommodations.

In *National Org. for Women v. Little League Baseball, Inc., supra,* the court determined that a place of public accommodations is dependent upon whether the organization engages in activities in places in which an unselected public is given an open invitation. It also concluded that this result obtained even though the entity was a "nonprofit or membership organization rather than a commercial enterprise, or [did] not have exclusive use or possession of the site of its operations." 127 N.J.Super. at 531–32, 318 A.2d at 38.

A similar result was reached in *United States Jaycees v. McClure,* 305 N.W.2d 764 (Minn.1981), where the court held that under the Minnesota Human Rights Act, the question whether an entity was a place of public accommodations turned ultimately on whether the organization invited only a screened and selected portion of the public, or whether instead it engaged in activities in places in which an unscreened, unselected, and unlimited number of persons from the general public was invited.

A volunteer group of power boat enthusiasts was found to meet the public accommodations definition in *United States Power Squadron v. State Human Rights Appeal Bd.,* 59 N.Y.2d 401, 465 N.Y.S.2d 871,

452 N.E.2d 1199 (1983). New York's highest court concluded that the group conducted its activities at public schools, public buildings, public waterways, public parks, and public marinas. Thus, the place where the petitioner's meetings and activities occurred was a place of public accommodations. Other courts have also concluded that lack of control or possession of a particular meeting site does not preclude an organization from being a place of public accommodations. *See Quinnipiac Council, Boy Scouts of America, Inc. v. Commission on Human Rights & Opportunities,* 204 Conn. 287, 528 A.2d 352 (1987). *Cf. Isbister v. Boys' Club of Santa Cruz, Inc.,* 40 Cal.3d 72, 219 Cal.Rptr. 150, 707 P.2d 212 (1985) (Boys' Club which operated a community recreational facility was a "business establishment" under Unruth Civil Rights Act).

█ Because we find the foregoing authority persuasive, we reject the SSAC's argument that because the general public does not participate in interscholastic sports and because it does not operate any facility that is open to the public, it does not fall within the public accommodations definition. The critical point is that the SSAC regulates interscholastic athletics and its membership, all of which have a direct impact on the public school system. Thus, this entire activity is permeated with a general public interest through open spectator invitation to the sporting event which is generally conducted at a public facility. This is sufficient to meet the public accommodations definition.

Moreover, because the SSAC was legislatively created and endowed with powers legislatively prescribed to provide services in supervising interscholastic athletics, it also falls within the ambit of the Human Rights Act definition of public accommodations. Finally, the SSAC receives member-

---

**22.** Syllabus Point 1 of *Shepherdstown* provides: "A volunteer fire department, organized and operated pursuant to the laws of the State of West Virginia, and which receives funding from public sources, is a 'place of public ac-

commodations' as defined by *W.Va.Code,* 5–11–3(j) [1981], and is thereby subject to the provisions of The West Virginia Human Rights Act, *as amended, W.Va.Code,* 5–11–1 *et seq.*"

ship dues from the public schools, as well as gate receipts from the athletic events.[23]

### B.

### *Interscholastic Athletics*

 This is the first occasion that we have had to consider admission to try-out for an athletic team under our Human Rights Act. There are no applicable regulations. Elsewhere courts have referred to their state human rights acts, but have decided the issue on constitutional equal protection or equal rights grounds. *See Petrie v. Illinois High School Ass'n*, 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979); *Darrin v. Gould*, 85 Wash.2d 859, 540 P.2d 882 (1975).

In several cases, courts have concluded that their human rights acts extended equal protection into a given area and proceeded to hold that the applicable standard to apply to their human rights acts was the same standard used in equal protection analyses. This was the result reached by the Supreme Court of Michigan in *Department of Civil Rights ex rel. Forton v. Waterford Township Dep't of Parks and Recreation*, 425 Mich. 173, 387 N.W.2d 821 (1986). The Michigan Supreme Court found that despite the difference between language in the statute and in the constitutional equal protection clause, the same legal standard applied to both:

"In spite of the fact that the statute does not employ language identical to the Equal Protection Clause, we conclude, on the basis of the wording of the statute, its purpose as manifested in its legislative history, and on the mandate of article 1, § 2 of the constitution itself, that the Legislature did not intend by the words 'full and equal enjoyment' to create a standard less protective than the constitutional test developed by the

courts in the course of interpreting the equal protection provisions of both the Michigan and the United States Constitutions." 425 Mich. at 186, 387 N.W.2d at 827. (Footnote omitted).

The New Jersey Court of Appeals in *B.C. v. Board of Educ., Cumberland Regional School Dist.*, 220 N.J.Super. 214, 531 A.2d 1059 (1987), discussed New Jersey's antidiscrimination statute (N.J.S.A. 10:5–1) and a related statute prohibiting discrimination in education (N.J.S.A. 18:36A–20) and equated both of them to prescribe constitutional equal protection principles:

"*N.J.S.A.* 10:5–1 has been construed to permit reasonable restrictions which promote important governmental objectives.... Similarly, we have construed *N.J.S.A.* 18A:36–20 to simply extend the New Jersey constitutional bases to proscribed discrimination in respect to student opportunities to include gender in the education system.... We did not in that case, as petitioner contends, construe the statute to provide greater rights than those afforded under the State and Federal Constitutions." 220 N.J.Super. at 227, 531 A.2d at 1066. (Citations omitted).

We believe this is a reasonable approach to our Human Rights Act as it relates to claims of gender discrimination involving interscholastic athletics. The lack of any definitive legislative guidelines in this field compels the conclusion that the legislature intended to bring into play general equal protection principles.[24]

We have in Part II(A), *supra*, analyzed and applied equal protection principles and found that the regulation, as it relates to the games of baseball and softball, fails to meet the substantially equivalent standard. Since this same standard applies under our

---

**23.** The SSAC attempts to distinguish this case from *Shepherdstown* because dues received by the SSAC constitute only 1 percent of its budget; whereas, the Shepherdstown and Berkeley Springs Volunteer Fire Departments received 25 and 30 percent of their funding from government sources. We decline to limit the term "public accommodations" to such a narrow basis.

**24.** In making this determination, we wish to make it clear that general equal protection principles are not available to override any of the specific statutory provisions contained in our Human Rights Act. It is the absence of particular statutory language dealing with sports activities that has brought us to apply equal protection principles in this case.

Human Rights Act, we need not repeat the analysis here.

Ms. Israel does, however, claim her right to reasonable attorney's fees pursuant to W.Va.Code, 5–11–13(c), and we accord her such a right. This case is, therefore, remanded to the circuit court for a determination of her reasonable attorney's fees.

Reversed and remanded.