No. 22-0340 – *Potomac Comprehensive Diagnostic & Guidance Center v. L. K. and D. S.*

FILED

June 5, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WOOTON, Justice, concurring, in part, and dissenting, in part:

I concur in the majority's reversal and remand for a new trial in this matter; evidentiary errors plainly necessitate that result, as thoroughly and properly explained in the majority opinion. However, I dissent to the majority's conclusion that petitioner Potomac Comprehension Diagnostic & Guidance Center (hereinafter "Potomac") does not qualify as a "place of public accommodations" for purposes of the Human Rights Act ("HRA"). Potomac plainly offers and makes available its services to the general public—precisely as the statutory definition contemplates. The mere fact that its services are so specialized, and capacity so limited, such that it may service only a certain number of referrals does not diminish the fact that it operates for the benefit of and is "open to" the general public. As a State-regulated and funded entity, there is little doubt that the Legislature intended such a facility to be subject to the HRA's anti-discrimination provisions attendant to places of public accommodations.

The Legislature defined "place of public accommodations" as meaning "any establishment or person[] . . . which *offers its services*, goods, facilities, or accommodations to the general public, but shall not include any accommodations which are in their nature private." W. Va. Code § 5-11-3(j), in part (emphasis added). Potomac's public website states that it has been "Serving West Virginians with Developmental Disabilities since 1980," openly advertising and detailing its variety of services and soliciting referrals from

1

the general public.  THE POTOMAC CENTER, https://www.potomaccenter.com (last visited June 4, 2024).[1]  For purposes of the express language of the statute, it clearly "offers its services[] . . . to the general public[.]"  W. Va. Code § 5-11-3(j).  The majority fails to afford this statutory language any significance at all, and further fails to acknowledge that West Virginia Code § 5-11-15 requires this Court to "liberally construe[]" this and all other portions of the HRA "to accomplish its objectives and purposes."  Had it construed this definition liberally—or even literally—and in accordance with our prior caselaw, it would have concluded that Potomac easily qualifies as a place of public accommodations.

Instead, the majority summarily concludes that Potomac is not "*open to* the public" and does not "*provide services* to the general public" because it admits only "developmentally disabled children who satisfy certain criteria."  (Emphasis added).  However, the statute requires nothing so vague as being "open" to the public, nor does it require that goods, facilities, or services be *received*, but merely "offer[ed]" to the general public.[2]  W. Va. Code § 5-11-3(j).  And in fact, any member of the general public in need of Potomac's very particularized services—children suffering from developmental and

---

[1] With specific respect to its Title XIX IDD Waiver Program, it advertises "Conflict-Free Case Management services for *individuals in the community*."  THE POTOMAC CENTER, *Programs*, https://www.potomaccenter.com/copy-of-services-1 (last visited June 4, 2024) (emphasis added).

[2] Although the "open to the public" language is taken directly from *Skaff v. West Virginia Human Rights Commission,* 191 W. Va. 161, 444 S.E.2d 39 (1994), it provides no justification for straying from the text of the statute which contains no such language.

behavioral disorders—may access them pending Potomac's capacity and ability to provide those services based on diagnostic criteria. Nonetheless, the majority seizes upon these necessary conditions to the use of Potomac's services, concluding that it is not a place of public accommodations because "[n]o unscreened or unselected child may be placed at Potomac," citing *Skaff*.

This Court has previously rejected a "screened and selected" argument nearly identical to Potomac's. In *Israel by Israel v. West Virginia Secondary Schools Activities Commission*, 182 W. Va. 454, 388 S.E.2d 480 (1989), the West Virginia Secondary Schools Activities Commission ("SSAC") argued that it was not a place of public accommodations because it was "not open to the general public, but rather [was] limited to secondary school students who meet certain age, residency, and academic requirements." *Id*. at 462, 388 S.E.2d at 488. The *Israel* Court disagreed, finding that the more appropriate focus was on the operation and purpose of the entity to determine whether it fell within the statutory language.

In that regard, the *Israel* Court identified "two factors to determine" whether an entity is a place of public accommodations: 1) whether "it is created and operated pursuant to the laws of the State of West Virginia" and 2) "whether it receives funding from public sources." *Id*. at 463, 388 S.E.2d at 489. Finding the SSAC satisfied both factors, the *Israel* Court observed more broadly that the SSAC was "permeated with a general public interest" and therefore qualified as a "place of public accommodations." *Id*.

This analysis followed the precedent established a few years prior in *Shepherdstown Volunteer Fire Department v. State ex rel. State of West Virginia Human Rights Commission*, 172 W. Va. 627, 309 S.E.2d 342 (1983).  In *Shepherdstown*, the Court relied almost exclusively on the state regulation and public funding—including public solicitation of funds—to conclude that the volunteer fire departments at issue were places of public accommodations.  *Id*. at 635, 309 S.E.2d at 350.

Potomac bears all of these same hallmarks.  Potomac is funded, in part, through the Department of Human Services (formerly Department of Health and Human Resources) and also solicits funding from the general public on its website.  Potomac is heavily regulated under State law—evidence of the Legislature's recognition that entities like Potomac service vulnerable members of the general public and must be well-policed for the public welfare.  Further, it goes without saying that Potomac's services are geared entirely toward the public interest by providing valuable services to the State's developmentally disabled children and their families to enhance their quality of life, inuring to the overall benefit of the public at large.

The majority gives these factors short shrift, preoccupying itself instead with the screening process at Potomac.  Even if some measure of "selection and screening" were dispositive to the issue presented, necessary and unavoidable client intake limitations do not constitute a level of selection and screening that would cause Potomac to effectively fall under the only express statutory exemption—establishments which are "in their nature

4

private." *See* W. Va. Code § 5-11-3(j). Indeed, even the majority's examples of places of public accommodations—hotels, restaurants, or buses—have well-known, unremarkable, and often necessary criteria for access, i.e. capacity, dress codes, age limits, financial responsibility, safety concerns, etc., that could easily be characterized as "screening" criteria. The majority fails to explain how these differ to any meaningful degree from the diagnostic screening criteria exercised by Potomac.

Nor can the "screening" at issue here be distinguished from other establishments this Court has declared "place[s] of public accommodations." We long ago held that a county board of education is a place of public accommodations. *See* Syl. Pt. 2, *Bd. of Educ. of Cnty. of Lewis v. W. Va. Hum. Rts. Comm'n*, 182 W. Va. 41, 385 S.E.2d 637 (1989). However, public schools do not grant unfettered access or enrollment to the general public at large and have other well-known screening criteria for enrollment or general admittance to school facilities such as vaccinations, behavioral/disciplinary requirements, student/teacher ratios, general safety considerations, etc. We recognized precisely this type of ordinary, "qualifying" criteria that appends to virtually any place of public accommodations in *Charleston Academy of Beauty Culture, Inc. v. West Virginia Human Rights Commission*, No. 11-1286, 2012 WL 3129142 (W. Va. May 25, 2012) (memorandum decision). In *Academy of Beauty Culture*, we found a beauty college to constitute a place of public accommodations, recognizing that it provides services to "members of the public who *qualify as students*[.]" *Id*. at *11 (emphasis added). As instructed by *Israel* and *Shepherdstown*, we further emphasized the fact that the beauty

5

college "is regulated by the West Virginia Board of Barbers and Cosmetologists, and receives the benefits of publicly-funded student loan programs." *Id*.

The majority ignores these comparable cases, relying instead on the "unscreened and unselected" blurb from *Skaff*, which it extrapolates into a rigid, dispositive rule. 191 W. Va. at 163, 444 S.E.2d at 41. More importantly, this limited focus overlooks the broader analysis employed in *Skaff*. Rather than utilizing a strict "screening and selection" rule to exclude prisons from the HRA, the *Skaff* Court reached its decision by making the far more profound conclusion that prisoners themselves simply "are not members of the general public" based on the significant curtailment of their "civil liberties[.]" *Id*. To that end, the *Skaff* Court focused on the "exclusivity" of prisons to liken prisoners to members of a private club created by the Legislature—the lone category of establishment expressly exempted from the statutory definition at that time. *Id*. at 164, n.9, 444 S.E.2d at 42, n.9.

Nothing even remotely approximating the scenario in *Skaff* exists here. The children who reside at Potomac are not prisoners—they remain members of the general public whose civil liberties are fully intact and whose freedom from discrimination on the basis of their disability is specifically protected by the HRA. Nor are Potomac's residents essentially "exclusive" private club members who readily and willingly shed the protections of the HRA by seeking admission. They are members of the general public

6

with specialized needs—openly and proudly solicited by Potomac's public website—who stand to benefit from the particularized services provided by Potomac.

At base, the notion that a facility designed expressly for disabled children's exclusive use and benefit may somehow fall outside of the HRA's express prohibition on disability discrimination by places of public accommodations strains credulity. Despite staunchly professing it is not a place of public accommodations, Potomac's website twice tellingly professes: "No individual will be denied services solely because of age, race, sex, disability, or inability to pay." THE POTOMAC CENTER, *About Us*, https://www.potomaccenter.com/about-us (last visited June 4, 2024). This language—acknowledging obligations *specific* to places of public accommodations under the HRA's anti-discrimination provisions—is commonly posted by such establishments. This language serves to express to the general public a place of public accommodations' awareness of its obligations under the HRA—obligations which the majority opinion permits it to evade.[3] To that limited aspect of the majority's otherwise well-reasoned opinion, I respectfully dissent.

---

[3] This acknowledgment is not diminished by the fact West Virginia Code of State Rules § 78-3-5.2.2 requires "organizational policy" to include this statement. In fact, the Legislature's approval of this rule could be fairly construed as suggesting it required this statement because it viewed facilities like Potomac as a place of public accommodations subject to the HRA.