IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

No. 18-0018

FILED

April 29, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

MURRAY ENERGY CORPORATION and
CONSOLIDATION COAL COMPANY,

Plaintiffs Below/Petitioners

v.

DALE W. STEAGER, STATE TAX COMMISSIONER OF WEST VIRGINIA;
THE COUNTY COMMISSION OF MARSHALL COUNTY; and
CHRISTOPHER J. KESSLER, Assessor of Marshall County,

Respondents Below/Respondents

Appeal from the Circuit Court of Marshall County
The Honorable Jeffrey D. Cramer, Judge
Civil Action No. 16-P-16

AFFIRMED

Submitted:  February 13, 2019
Filed:  April 29, 2019

Mark Gaydos, Esq.
Buddy Turner, Esq.
McNeer, Highland, McMunn, and
Varner, L. C.
Kingwood, WV
Counsel for Petitioners

Patrick Morrisey, Esq.
Attorney General
Katherine A. Schultz, Esq.
Senior Deputy Attorney General
Cassandra L. Means, Esq.
Assistant Attorney General
Charleston, WV
Counsel for Respondents Dale W.
Steager, State Tax Commissioner of
West Virginia, and Christopher J.
Kessler, Assessor of Marshall County

Joseph R. Canestraro, Esq.
Rhonda L. Wade, Esq.
Office of the Marshall County Prosecuting Attorney
Moundsville, WV
Counsel for Respondent County Commission
of Marshall County

Kelli D. Talbott, Esq.
Senior Deputy Attorney General
Charleston, WV
Counsel for Amicus Curiae Steven L. Paine,
West Virginia State Superintendent of Schools

JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE JENKINS dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.      "As a general rule, there is a presumption that valuations for taxation purposes fixed by an assessor are correct. Thus, a tax assessment of coal property will be presumed to be correct when the assessor, in assessing the coal property: (1) relies upon the legislative rules prescribing the methods by which property is to be assessed; and (2) uses, as a guide, information furnished by the tax department, such as a list of comparable sales of similar property. The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous." Syl. Pt. 2, *W. Pocahontas Properties, Ltd. v. Cty. Comm'n of Wetzel Cty.*, 189 W. Va. 322, 431 S.E.2d 661 (1993).

2.      "In a case involving the assessment of property for taxation purposes, which does not involve the violation of a statute governing the assessment of property, or a violation of a constitutional provision, or in which a question of the constitutionality of a statute is not involved, this Court will not set aside or disturb an assessment made by an assessor or the county court, acting as a board of equalization and review, where the assessment is supported by substantial evidence." Syl. Pt. 2, *In re Tax Assessments Against the South Land Co.*, 143 W. Va. 152, 100 S.E.2d 555 (1957), *overruled in part by In re Kanawha Val. Bank*, 144 W. Va. 346, 109 S.E.2d 649 (1959).

i

3.  "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

4.  "It is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority." Syl. Pt. 3, *Rowe v. W. Va. Dep't of Corr.*, 170 W. Va. 230, 292 S.E.2d 650 (1982).

5.  "Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage." Syl. Pt. 3, *Appalachian Power Co. v. State Tax Dep't of W. Virginia*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

6. "If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va. Code, 29A–4–2 (1982)." Syl. Pt. 4, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

7. The methodology of calculating and use of the annual average Steam Coal Price Per Ton and coal seam thickness averages for *ad valorem* tax valuation purposes, as set forth in West Virginia Code of State Rules § 110-1I-1 *et seq*. (2006), does not violate the requirement contained in West Virginia Code § 11-6K-1(a) (2010) that natural resources property be assessed based upon its "true and actual value."

8. "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution." Syl. Pt. 4, *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989).

9.	"'""Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally. Where such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause." Syllabus Point 7, [as modified,] *Atchinson v. Erwin*, [172] W.Va. [8], 302 S.E.2d 78 (1983).' Syllabus Point 4, as modified, *Hartsock-Flesher Candy Co. v. Wheeling Wholesale Grocery Co.*, 174 W.Va. 538, 328 S.E.2d 144 (1984)." Syl. Pt. 4*, Gibson v. W. Virginia Dep't of Highways,* 185 W. Va. 214, 406 S.E.2d 440 (1991), *holding modified by Neal v. Marion*, 222 W. Va. 380, 664 S.E.2d 721 (2008).

10.	The valuation methodology contained in West Virginia Code of State Rules § 110-1I-1 *et seq*. (2006) for the calculation and use of an average Steam Coal Price Per Ton and average coal seam thickness does not violate the equality provision of West Virginia Constitution Article X, Section 1 or the equal protection provisions of the West Virginia and United States Constitutions.

WORKMAN, Justice:

This is an appeal from the Circuit Court of Marshall County's order affirming the Board of Equalization and Review's determination that petitioners Murray Energy Corporation and Consolidation Coal Company's coal interests were properly valued and assessed by respondents Dale W. Steager, State Tax Commissioner of West Virginia, the County Commission of Marshall County, and Christopher J. Kessler, Assessor of Marshall County. The circuit court concluded that the method of valuing coal properties as prescribed in the Code of State of Rules violated neither the statutory requirement of assessment at "true and actual value" nor the constitutional equality requirements of Article X, Section 1 of the West Virginia Constitution and the Equal Protection provisions of the United States and West Virginia Constitutions.

Upon careful review of the briefs of the parties and amicus curiae,[1] the appendix record, the arguments of the parties, and the applicable legal authority, we agree with the circuit court's legal conclusions and therefore affirm the December 7, 2017, order of the Circuit Court of Marshall County, West Virginia.

---

[1] Respondent County Commission of Marshall County submitted a summary response in support of the circuit court's order. Amicus curiae Steven L. Paine, West Virginia State Superintendent of Schools, likewise submitted a brief in support of the circuit court's order. The Court acknowledges and expresses its appreciation for the amicus curiae's submission.

1

## I. FACTS AND PROCEDURAL HISTORY

Petitioners Murray Energy Corporation and Consolidation Coal Company (hereinafter "petitioners") are owners of coal interests in Marshall County. These coal interests are appraised for *ad valorem* tax purposes by respondent Dale Steager, State Tax Commissioner of West Virginia (hereinafter "Tax Department") and assessed by the respondents County Commission of Marshall County through its Assessor, Christopher J. Kessler. The Tax Department utilizes a "statewide mass appraisal system" for valuation of active and reserve coal properties, as described in West Virginia Code of State Rules § 110-1I-1 *et seq.* (2006).[2] This case involves the Tax Department's use of certain averages for purposes of valuing petitioners' coal interests through the mass appraisal system.

THE MASS APPRAISAL SYSTEM AND LEGISLATIVE RULES

The mass appraisal system utilized by the Tax Department for valuation of coal property values the coal inside the mine, rather than the mine itself; it uses the income approach to value, which assumes that property is worth its future income, discounted to present value. The Tax Department similarly uses mass appraisal systems for the valuation of oil and gas, timber, and residential properties. The Tax Department explains that a mass

---

[2] Mass appraisal has been aptly described as "'the process of valuing a universe of properties as of a given date utilizing standard methodology, employing common data, and allowing for statistical testing[.]'" *In re Johnson Cty. Appraiser/Privitera Realty Holdings*, 283 P.3d 823, 834 (Kan. 2012) (quoting Uniform Standard of Professional Appraisal Practices, Definitions, p. 8 (1992)). It is the methodology and "common data" which is at issue in this case.

appraisal system is utilized because the Tax Department does not have the resources to annually reassess each individual property inasmuch as there are more than 240,000 coal parcels requiring appraisal. The methodology for valuation of coal interests, as outlined in the Code of State Rules, was developed through the legislative rule-making process.

As indicated, the appraisal system uses averages for certain values necessary to calculate the value of the minerals, rather than individualized data. The two averages being challenged herein—the statewide Steam Coal Price Per Ton average ("SCPPT") and the seam thickness average—are calculated by using the sources and formulas prescribed by regulation. These averages are then filed with the West Virginia Secretary of State as "natural resource valuation variables" and made available for public comment annually.

According to the Tax Department, the SCPPT average for any particular year is calculated by using 1) confidential data[3] concerning purchases of coal obtained from the West Virginia Public Service Commission and reports of fuel purchases from the Federal

---

[3] *See* W.V.C.S.R. § 11-1I-4.10 ("Confidentiality -- All information provided by or on behalf of a natural resources property owner or by or on behalf of an owner of an interest in natural resources property to any state or county representative for use in the valuation or assessment of natural resources property or for use in the development or maintenance of a legislatively funded mineral mapping or geologic information system is confidential. The information is exempt from disclosure under provisions of West Virginia Code § 29B-1-4, and shall be kept, held, and maintained confidential except to the extent the information is needed by the State Tax Commissioner to defend an appraisal challenged by the owner or lessee of the natural resources property subject to the appraisal . . . .")

Energy Regulatory Commission/the U. S. Energy Information Administration; 2) published information from major coal companies; 3) royalty information derived from county courthouses; and 4) industry publications.[4] Only West Virginia-sourced coal information is utilized from these databases. The SCPPT average for any particular tax year is derived by averaging the price per ton for the three years preceding the tax year, *i.e.*, a "three-year rolling average."[5]

In this case, the 2016 tax year SCPPT is being challenged, which was calculated by using the variables provided in tax years 2012 through 2014—the three years preceding the assessment date of July 1, 2015—for the 2016 tax year. On June 30, 2015, the Tax Department filed the variables for the 2016 tax year and declared the SCPPT to be $60.35/ton. This figure was left open for public comment until August 15, 2015. Petitioners did not provide comment.

As for the coal seam thickness average, seams of coal vary in thickness and density, which obviously determines the amount of coal at any particular location. The

---

[4] *See* W.V.C.S.R. § 110-1I-4 ("Valuation Methods"), generally.

[5] *See* W.V.C.S.R. § 110-1I-3.12 ("'Average coal price' for purposes of the reserve coal valuation model, means the arithmetic mean of the sum of the last three calendar years of total FOB-source (point of sale, no transportation) values of steam coal mined in West Virginia and sold on the spot market as reported on FERC Form 423 to the United States Department of Energy (USDOE) and to the West Virginia Public Service Commission (WVPSC) . . . .").

4

Legislature determined that use of an average to estimate the seam thickness at any given location based on acreage was appropriate; the formula provided by legislative rule calculates the average seam thickness to be approximately 1,800 tons per acre foot, which figure is published by the United States Geologic Survey.[6] This coal seam thickness average is expressly set forth in the regulation and does not vary from year to year. Other neighboring states' geological surveys (Kentucky, Ohio, and Pennsylvania) likewise use this figure.

On January 22, 2016, petitioners protested the Tax Department's valuation of their Marshall County coal interests for the 2016 tax year to the Marshall County Commission sitting as the Board of Equalization and Review (the "Board"). Petitioners challenged the Tax Department's use of the coal seam thickness average and rolling three-year average to determine the average steam coal price per ton rather than the "spot price" of coal as of the July 1, 2015, assessment date. Petitioners argued that these methodologies and averages did not reflect the "true and actual" value of their coal properties, causing them to be over-valued for *ad valorem* taxation purposes.

Before the Board, John L. Weiss, a mineral extraction consultant, testified on behalf of petitioners. He stated that the average price per ton for petitioners' coal

---

[6] The regulations define "1800 tons per acre foot" as "the weight, in tons, of a relatively clean coal bed one (1) foot in thickness (Thk) and covering one (1) acre, that has an assumed specific gravity of 1.32. The formula for calculating '1800 tons per acre foot' is set forth in Appendix A, Formula 2 of this rule." W.V.C.S.R. § 110-1I.3.61.

reserves as of the assessment date of July 1, 2015 was actually $41.08/ton, which figure was derived from well-recognized industry publications. He further testified that this amount was consistent with his industry knowledge and experience and that the $60.35/ton price set by the Tax Commissioner for the 2016 tax year was inflated. Even utilizing the three-year rolling average, but including only publicly-available rather than confidential data, Mr. Weiss testified that the average price per ton was $51.50, rather than $60.35/ton.

Jeffrey Kern, a mineral appraisal expert who helped design the State's mass appraisal system during its legislative development, testified on behalf of the Tax Department. Mr. Kern explained that the coal property mass appraisal system was designed to eliminate "peaks and valleys" in the price of coal and allow for greater predictability of tax burdens and revenues by the taxpayer and the State, respectively. Mr. Kern further explained that this method was carefully constructed through the legislative rule-making process and extensively involved stakeholders like petitioners' predecessor in interest, Consolidation Coal Company. He testified that this averaging system—utilizing the rolling three-year historical average—resulted in the $60.35/ton price upon which petitioners were taxed for the 2016 tax year. He explained that use of a mass appraisal system is necessary because the State "can't, on an annual basis, have assessors go out and reassess every individual property as though you were hiring a real estate agent[.]"

Mr. Kern further testified that the average seam thickness figure—calculated pursuant to regulation to equate to precisely 1,793.97 tons per foot per acre—is "rounded

6

up" to 1,800 by legislative rule because it is a "published piece of information . . . [and] [t]here was no sense in reinventing the wheel there."[7] He testified that taxpayers may supply specific data regarding their seam thicknesses and mineability for inclusion in the state database, but that petitioners had historically failed to do so. Further, Mr. Kern noted that taxpayers are also permitted to provide an appendix ("Table F") with their return which states how much coal they sold and at what price, but petitioners had not historically provided this information either.[8]

Critically, Mr. Kern admitted that the $60.35/ton is in fact higher than what the average price per ton was as of the assessment date of July 1, 2015, by design and was the result of using the three-year rolling average. He explained that using an historical rolling average serves to even out highs and lows in the price of coal and that the "inflated" $60.35/ton price was an effort to even out the "valley" currently occupied by coal prices. Mr. Kern explained, "[W]e're doing a mass appraisal system. *Some places are getting less tax than they could, and some places are getting a little more tax than they could*."

---

[7] Mr. Kern indicated that other entities use this figure including the United States Geologic Survey, the Kansas Geologic Survey, the Pennsylvania Geologic Survey, "2 or 3 mineral economics courses," and the State of Kentucky. We note that West Virginia Code § 11-1C-10(d)(2) (1994) provides that "[f]ormulas for natural resources valuation may contain differing variables based upon known geological or other common factors."

[8] Neither Mr. Kern (nor the Tax Department in its briefing) indicated how this information would be utilized if provided; in fact, Mr. Kern cautioned against considering this information because it cannot be verified.

(emphasis added). Mr. Kern conceded that the information provided by the PSC, FERC, and published data by *Platts*, *Coal Week*, and *S & L*[9] placed the average coal price per ton "substantially lower" than $60.35/ton for the specific assessment year of 2015, but that the difference in the SCPPT was occasioned by use of the three-year rolling average as required by legislative rule.

Upon consideration of the foregoing testimony,[10] the Board denied the protest. Petitioners appealed to the circuit court and, after briefing by the parties, the circuit court likewise denied the appeal, affirming the Board's rejection of petitioners' protest. Adopting the Tax Department's position wholesale, the circuit court concluded that because the Constitution provides that "value" is "to be ascertained as directed by law," the legislative rules are the Legislature's manner of directing the determination of value. It found that petitioners failed to establish that the Tax Department's calculations were inaccurate, but rather proposed new methodologies to displace the one prescribed by legislative rule. As to petitioners' equal protection argument, the circuit court concluded

---

[9] These are well-known industry publications. Mr. Kern indicated that these publications are "consulted" in developing the SCPPT average.

[10] The testimony in this case occurred over the course of two hearings before the Board. On February 18, 2016, two witnesses on behalf of petitioners testified at an unnoticed hearing; no one testified on behalf of the Tax Department. Regardless, the Board denied the protest. On March 17, 2016, petitioners appealed that decision to the circuit court and the circuit court remanded the matter back to the Board to take the above testimony from the Tax Department's expert, which again resulted in the Board's denial of the protest.

that petitioners failed to prove that the methodology was misapplied or that they were being treated differently than other taxpayers. This appeal followed.

## II. STANDARD OF REVIEW

Generally, "there is a presumption that valuations for taxation purposes fixed by an assessor are correct. . . . The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous." Syl. Pt. 2, in part, *Western Pocahontas Props., Ltd. v. County Comm'n of Wetzel Cty*, 189 W. Va. 322, 431 S.E.2d 661 (1993). However,

> [i]n a case involving the assessment of property for taxation purposes, which *does not* involve the *violation of a statute governing the assessment of property, or a violation of a constitutional provision,* or in which a question of the constitutionality of a statute is not involved, this Court will not set aside or disturb an assessment made by an assessor or the county court, acting as a board of equalization and review, where the assessment is supported by substantial evidence.

Syl. Pt. 2, *In re Tax Assessments Against the South Land Co.*, 143 W. Va. 152, 100 S.E.2d 555 (1957), *overruled on other grounds by In re Kanawha Val. Bank*, 144 W. Va. 346, 109 S.E.2d 649 (1959) (emphasis added). As statutory and constitutional issues are squarely implicated in the instant case, any suggested deference or other reduced level of scrutiny is inapplicable.

Rather, "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power*

9

*Co. v. State Tax Dep't*, 195 W. Va. 573, 466 S.E.2d 424 (1995). Further, "[c]onstitutional challenges . . . are reviewed pursuant to a *de novo* standard of review." *Morris v. Crown Equip. Corp.*, 219 W. Va. 347, 352, 633 S.E.2d 292, 297 (2006). However, we are mindful that "[a]n inquiring court—even a court empowered to conduct *de novo* review—must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion." *Id*. at 582, 466 S.E.2d at 433.

## III.  DISCUSSION

Petitioners make three arguments in support of their position that the Tax Department's valuation must be set aside:  1) that the mass appraisal methodology utilized by the Tax Department as prescribed by regulation violates statutory authority requiring tax assessments to be based on "true and actual" value; 2) that the methodology violates the West Virginia Constitution's "equal and uniform" taxation requirement; and 3) that the methodology is similarly violative of the Equal Protection provisions of the United States and West Virginia Constitutions.  Petitioners emphasize that the monetary significance of the purported over-valuation rendered by use of the methodology is substantial.  Petitioners assert that as a result of the "rounded up" 1,800 seam thickness average, they are taxed on approximately 1.1 million tons of coal they do not actually own.  Combined with the allegedly inflated figure of $60.35/ton, petitioners assert this results in a $65 million over-valuation of their coal properties.

The Tax Department responds primarily that the Constitution expressly delegates development of the valuation methodology to the Legislature and that it has no authority to deviate from the methodology delineated in the legislatively-approved regulations. The Tax Department stresses that petitioners do not suggest that it failed to properly apply the regulations; rather, they take issue with the legislatively-developed methodology mandated therein. In that regard, the Tax Department does little to argue in support of the validity of the regulations; rather, it largely defaults to its obligation to faithfully apply the regulations as written. Insofar as the alleged constitutional violations, the Tax Department argues that the regulations are applied uniformly for all similarly-situated taxpayers and therefore no equality violation is present. We will examine each of these arguments in greater detail.[11]

A.    STATUTORY VIOLATION AND VALIDITY OF THE REGULATIONS

We begin with petitioners' assertion that the regulations setting forth the mass appraisal methodology for valuation of their coal properties is in violation of West Virginia's statutory taxation mandates. Petitioners argue that by taxing its coal reserves at average seam thickness amounts[12] and using historically-averaged prices that do not reflect

---

[11] Because the Constitution's "equal and uniform" taxation provision invokes equality, it is similar in complexion to the petitioners' equal protection argument and is therefore collectively discussed more fully *infra.*

[12] While petitioners challenged the use of the coal seam thickness average below and before this Court, the bulk of their legal analysis is dedicated to the SCPPT average.

the market value as captured on the assessment date of July 1, they are being taxed in violation of the requirement contained in West Virginia Code § 11-6K-1(a) (2010) that properties be assessed at their "true and actual value": "All industrial property and natural resources property shall be assessed annually as of the assessment date at sixty percent of its true and actual value." In support, they draw particular focus to the language of the legislative intent expressed in the statutory taxation scheme:

> The Legislature hereby finds and declares that all property in this state should be fairly and equitably valued wherever it is situated so that all citizens will be treated fairly and no individual species or class of property will be overvalued or undervalued in relation to all other similar property within each county and throughout the state.

W. Va. Code § 11-1C-1(a) (1990).

The Tax Department counters that per the language of the Constitution itself, value is to be ascertained "as directed by law": "[T]axation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law." W. Va. Const., art. X, § 1. As previously indicated, the Tax Department underscores that petitioners do not accuse them of misapplying the methodology, not evenly applying the methodology to all coal property taxpayers, or violating the regulations in any way. Therefore, they argue, by correctly applying this methodology to all coal properties, both observance of the statutory requirements and equal and uniform taxation "as directed by law" are effectuated.

12

Petitioners are quick to reply that the Tax Department's blind adherence to proper application of the regulation fails to squarely address whether the Constitution's "as directed by law" language enables the Tax Department to devise, by legislative rule, a methodology that admittedly fails to provide a value that is reflective of coal prices as of the assessment date. We agree that the Tax Department's position herein is relatively unedifying as to the propriety of the regulations as pertains to West Virginia Code § 11-6K-1(a)'s "true and actual" requirement. Instead, the Tax Department focuses on its strict compliance with the regulations.[13]

The West Virginia Constitution article ten, section one provides that "taxation shall be equal and uniform throughout the state" and that all property is to be taxed "in proportion to its *value to be ascertained as directed by law*." (emphasis added). To that end, West Virginia Code § 11-6K-1 provides that natural resources property shall be assessed "at sixty percent of its *true and actual value*."[14] (emphasis added).

---

[13] "Of course, an agency must follow and apply its rules and regulations in existence at the time of agency action." *Appalachian Power Co.*, 195 W. Va. at 583 n.8, 466 S.E.2d 434 n.8. That the Tax Department was constrained to follow the regulations appears never to have been in dispute; rather, petitioners assert that the regulations violate the statute's "true and actual" language and the equality provisions of the Constitution.

[14] In their briefs, the parties engage in an initial debate about which taxation statute applies here: the "general" taxation statute contained in West Virginia Code § 11-3-1 (2014) or the more specific "natural resources" taxation statute located at West Virginia Code § 11-6K-1. West Virginia Code § 11-3-1(a) states:

Critically, West Virginia Code § 11-1C-10(e) directs that "[t]he Tax Commissioner shall develop a plan for the . . . valuation of natural resources property." The statute further requires the Tax Department to "maintain accurate values for all such property." W. Va. Code § 11-1C-10(d). The regulations for valuation of active and reserve coal properties for *ad valorem* purposes are contained in West Virginia Code of State Rules § 110-1I-1 *et seq*. These legislative rules were approved by the Legislature on March 11, 2006, becoming effective on May 1, 2006.[15] W. Va. C.S.R. § 110-1I-1.4. As is well-established, legislative rules have the force and effect of law. *See* Syl. Pt. 5, *Smith v. W.*

> *All* property, except public service businesses assessed pursuant to article six [§§ 11-6-1 et seq.] of this chapter, shall be assessed annually as of July 1 at sixty percent of its *true and actual value*, that is to say, *at the price for which the property would sell if voluntarily offered for sale by the owner thereof* .
> . . .

(emphasis added). Petitioners argue that this general taxation statute is applicable and is significant because it "defines" true and actual value as the "market value," which must necessarily be the market value as of the assessment date of July 1. The Tax Department counters that the more specific natural resources taxation statute contained in West Virginia Code § 11-6K-1—which provides no definition for "true and actual value"—is applicable.

Where two statutes "govern a particular scenario, one being specific and one being general, the specific provision prevails." *Bowers v. Wurzburg*, 205 W. Va. 450, 462, 519 S.E.2d 148, 160 (1999). Therefore, while we agree that the more specific natural resources statute is applicable, this conclusion does little to advance our analysis. All parties appear to agree that "market value" is utilized to determine true and actual value; the disagreement presented herein is how that value is determined.

[15] *See* 2006 W. Va. Reg. Text 16090 ("Valuation of Active and Reserve Coal Property for Ad Valorem Property Tax Purposes[.] The above rule has been authorized by the West Virginia Legislature.")

14

*Va. Human Rights Comm'n*, 216 W. Va. 2, 602 S.E.2d 445 (2004) ("A regulation that is proposed by an agency and approved by the Legislature is a "legislative rule" as defined by the State Administrative Procedures Act, W. Va. Code, 29A–1–2(d) [1982], and such a legislative rule has the force and effect of law."). West Virginia Code of State Rules § 110-1I-1.1 expressly states that "[t]his rule *clarifies and implements* State law as it relates to the appraisal at market value of active and reserve coal properties." (emphasis added).

While "[i]t is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions," it is equally well-established that "[i]n exercising that power [] an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority." Syl. Pt. 3, *Rowe v. W. Va. Dep't of Corr.* 170 W.Va. 230, 292 S.E.2d 650 (1982). Accordingly, the initial question raised by petitioners' challenge is whether the regulations conflict with the language of the statute requiring assessment at "true and actual value"[16] or, rather, properly inform that requirement in a manner deemed appropriate by the agency charged with its

---

[16] The Tax Department correctly notes that the present iteration of West Virginia Code § 11-6K-1 was passed in 2010 and that the regulations were adopted in 2006. It therefore argues that had the Legislature intended to displace this methodology, it could have done so in the statute and that the statute is a *de facto* "reaffirmance" of the methodology. However, the Legislature's imprimatur, without placing it into the proper legal context, adds little to the analysis.

15

implementation. As such, we find that this presents a quintessential issue of agency deference, necessitating the well-recognized *Chevron*[17] analysis.

This Court has held that "[i]n deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." Syl. Pt. 3, in part, *Appalachian Power Co.*, 195 W. Va. 573, 466 S.E.2d 424. In that regard,

> [t]he court first[18] must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage.

---

[17] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984). As explained by Justice Cleckley, "*Chevron* . . . was a watershed decision in the area of judicial deference to regulatory agencies." *Appalachian Power,* 195 W. Va. at 582 n.6, 466 S.E.2d at 433 n.6.

[18] *Chevron* requires, as a threshold inquiry, a determination as to whether the legislative rule is valid:

> A legislative rule is valid if (1) it is submitted to the legislative rule-making review committee for approval, as required by W. Va. Code § 29A-3-9, *et seq.*, or (2) the Legislature expressly exempts it from such legislative rule-making review and approval pursuant to W. Va. Code § 29A-1-3(d) (1990) (Repl. Vol. 2002).

Syl. Pt. 13, *Simpson v. W. Va. Office of Ins. Comm'r*, 223 W. Va. 495, 678 S.E.2d 1 (2009). In this instance, West Virginia Code of State Rules § 110-1I-1 *et seq*. is unquestionably a valid legislative rule. *See* n.15 *supra*.

16

*Id.* (footnote added). However,

> [i]f legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court.

Syl. Pt. 4, in part, *id.*

A nearly identical challenge to a tax regulation was launched in 1995, the Court's examination of which demonstrates the proper application of the *Chevron* analysis. In *Appalachian Power*, appellant challenged a regulation that dealt with a tax imposed on the "net generation of electricity available for sale." *Id.* at 579-80, 466 S.E.2d at 430-31. The regulation prescribing the "net" taxable amount prohibited deduction of line loss or company use to determine the amount "for sale." *Id.* at 580, 466 S.E.2d at 431. During the regulation's development and approval by the legislature, a legislative attorney opined that the regulation conflicted with the statute, but it was approved regardless by the Legislative Rulemaking Committee. *Id.* at 580-81, 466 S.E.2d at 431-32. Petitioner challenged the regulation arguing, among other things, that the enabling statute was at odds with the prohibited deduction contained in the regulation and "impermissibly differentiate[d]" between taxpayers, in violation of the equality provisions of the Constitution. *Id.* at 581, 466 S.E.2d 432.

The *Appalachian Power* Court noted generally that "a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or it is arbitrary or capricious." *Id.* at 585, 466 S.E.2d at 436. Accordingly, "the appropriate level of consideration due [a legislative rule] depends on its clarity[.]" *Id.* at 586, 466 S.E.2d at 437. The Court explained that the first step of *Chevron* required it to review the legislative rule to determine if it was "clear as to its intent and not contrary to the legislative enactment that triggered its promulgation[.]" *Id.* at 586, 466 S.E.2d 437. If so, the rule must simply be applied. *Id.* To perform this analysis, "a court must look primarily to the plain meaning of the statute, drawing its essence from the 'particular statutory language at issue, as well as the language and design of the statute as a whole.'" *Id.* (quoting *Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).

However, to whatever extent a statute does not reveal "an unmistakably clear expression of legislative intent," the Court must "examine the agency's interpretation to see how it relates to the statute." *Id.* at 587-88, 466 S.E.2d at 438-39. The Court warned that at this reconciliation stage, "deference looms large . . . . [and the analysis] involves a high degree of respect for the agency's role." *Id.* The Court warned that only "some [] startling revelation of fact" would overcome a legislative rule that is not otherwise at odds with a conflicting statute nor presents a "defect in the rulemaking process, [or] evidence of bias or abuse of power[.]" *Id.* at 589, 466 S.E.2d at 440.

18

The *Appalachian Power* Court provided numerous instructive statements relative to examining tax regulations, all of which unmistakably signal that the agency has significant leeway in crafting taxation methodologies: "[T]he Tax Commissioner need not write a rule that serves the statute in the best or most logical manner; he need only write a rule that flows rationally from the statute." *Id*. at 588, 466 S.E.2d at 439. The Court reminded that it had previously "stressed the importance of liberally permitting administrative agencies to carry out legislative dictates . . . [and that] aggressive judicial intervention would disrupt agency processes and negate the legislative body's legitimate delegation of authority." *Id*.

> Significantly, the Court stated that
>
> "[i]n the absence of . . . [legislative] direction as to what elements are to be considered in promulgating . . . [a] rule, the presumption is that . . . *[the Legislature] is entrusting the decision as to what to consider in the hands of the agency* in deference to agency expertise."

*Id*. at 589, 466 S.E.2d at 440 (quoting *Kennedy v. Block*, 606 F. Supp. 1397, 1403 (W.D. Va. 1985)) (emphasis added). The Court found that deference was particularly necessary where "a technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations. Under such circumstances, the argument for deference is at its strongest." *Id*. at 589-90, 466 S.E.2d at 440-41. As a result, the Court upheld the regulation, finding that "[w]ithout question, the Legislature intended the defendants, the Tax Department and the Tax Commissioner, to have the authority to interpret [the taxation statute]." *Id*. at 590, 466 S.E.2d at 441.

19

Under this analysis, it is clear that the "true and actual" language of West Virginia Code § 11-6K-1(a) is fairly broad and non-specific as to its implementation inasmuch as it does not prescribe a methodology for determining "true and actual" value. More pointedly, West Virginia Code § 11-1C-10(e) expressly directs the Tax Department to "develop a plan for the . . . valuation of natural resources property." Accordingly, our taxation scheme for natural resources property does not contain merely an *implicit* "gap" in its directives, but an *express* gap, which it directs the Tax Department to close by developing valuation methodologies:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron*, 467 U.S. at 843-44.

This brings our analysis to the second stage of *Chevron*, which is whether the agency's interpretation rationally flows from the enabling statute. As previously indicated, the agency need not employ the "best" or "most logical" methodology, but rather one which is rationally based on the enabling statute. We find that there is little question that the regulations here are a rational and necessary means to establish true and actual value.

The methodology for valuing coal properties contained in the extensively detailed and thoroughly described regulations bears all of the hallmarks of those

20

regulations found by the Supreme Court to be rationally conceived, *i.e.* "the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies." *Chevron*, 467 U.S. at 865. As Mr. Kern testified, the methodology utilizing the historical rolling three-year average was formulated after extensive debate and collaboration via the legislative rule-making process. [19] The methodology seeks to create an equilibrium between fluctuating coal pricing and taxation. While petitioners lament the use of the trailing average in the current market "valley," without question, this methodology conceptually provides an equal benefit in the event of a pricing peak. [20] The stabilizing effect of the rolling historical average brings predictability to both the taxpayer and the State.

In fact, it is the "trailing" or "rolling" aspect of the methodology which distinguishes it from the "frozen" years-old values struck down in *Arkansas Public Service Commission v. Pulaski County Board of Equalization*, 582 S.W.2d 942 (Ark. 1979) upon which petitioners heavily rely. In *Arkansas Public Service Commission*, residential values

---

[19] *Cf.* Syl. Pt. 5, in part, *In re Tax Assessment Against Am. Bituminous Power Partners, L.P.*, 208 W. Va. 250, 539 S.E.2d 757 (2000) ("Title 110, Series 1P of the West Virginia Code of State Rules confers upon the State Tax Commissioner discretion in choosing and applying the most accurate method of appraising commercial and industrial properties.").

[20] In fact, Mr. Kern testified that "up until 2012, the statewide average was actually less than the PSC. So that, in essence, it's been argued in various places that the State was giving all the taxpayers a discount because we were using trailing averages, and trailing averages were below the rise in price over time."

21

were "frozen" as of 1956, and timber and farm land values were "frozen" as of 1961 by operation of statute which required use of a 1972 manual. *Id*. at 944. In contrast, the methodology here annually revitalizes itself with use of the most recent three years' coal prices. As Mr. Kern explained, the process of assessment by its very nature always uses trailing information: "[N]o matter what you do in the tax assessment basis, you are always going to be at least a year behind, if not two years behind in your data, just by the nature of what we do." Therefore, it is clear that the methodology is both rationally based and reasonably flows from the statutory language.

We are particularly given to this conclusion by virtue of the unrebutted evidence presented below indicating that petitioner Consolidation Coal Company (predecessor-in-interest to petitioner Murray Energy) was extensively involved in the rule-making process that it now challenges. Furthermore, petitioners' failure to provide public comment to the 2016 tax year variables or provide "Table F" information regarding their actual sales is problematic. As the *Appalachian Power* Court observed, "[d]eference to the [agency's] interpretation 'is especially appropriate where the rule was adopted only after all interest [*sic*] persons were given notice and opportunity to comment[.]'" *Id*. at 592, 466 S.E.2d at 443 (quoting *Va. Agr. Growers Ass'n, Inc. v. Donovan*, 579 F. Supp. 768, 773 (W.D. Va. 1984)). Stakeholder involvement in development of the methodology casts a pronounced pall over a subsequent legal challenge, absent some misapplication or misinterpretation of the regulation.

22

As Justice Cleckley emphatically observed, "[a]s a matter of law and policy, this is a paradigm example of a complex economic and taxation inquiry that our Legislature has wisely left to resolution by the State's taxing authority pursuant to its statutory mandate." *Id*. at 592, 466 S.E.2d at 443. The instant case presents a virtually identical scenario. We are likewise reminded of the Supreme Court's commentary in *Chevron* that

> [t]he arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency . . . but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges.

*Chevron,* 467 U.S. at 864.

Like the agency action in *Chevron*, we find that the methodology set forth in West Virginia Code of State Rules § 110-1I-1 *et seq.* insofar as the calculation of the SCPPT and seam thickness average reflects "a reasonable accommodation of manifestly competing interests." *Chevron*, 467 U.S. at 865.[21] Moreover, as cautioned in *Appalachian Power,* "[w]e will not set aside a formally adopted legislative rule without clearcut evidence of an inconsistency between the rule and the authorizing statute." 195 W. Va. at

---

[21] To that end, while the Court recognizes that other methods of calculating the taxable interest in coal resources exist, it is not the role of the Court to substitute its method of determining such methodology for that promulgated by the Tax Department and approved by the Legislature. Nonetheless, the Court encourages ongoing evaluation of these methodologies by the Tax Department, Legislature, and stakeholders in a manner sufficiently collaborative to ensure lawful processes which are consistent with the precepts outlined herein.

588, 466 S.E.2d at 439. There is no such evidence here. We therefore hold that the methodology of calculating and use of the annual average Steam Coal Price Per Ton and coal seam thickness averages for *ad valorem* tax valuation purposes, as set forth in West Virginia Code of State Rules § 110-1I-1 *et seq.*, does not violate the requirement contained in West Virginia Code § 11-6K-1(a) that natural resources property be assessed based upon its "true and actual value."

B.    CONSTITUTIONAL CHALLENGES:  "EQUAL AND UNIFORM" AND EQUAL
        PROTECTION

Notwithstanding the foregoing conclusion that the methodology prescribed by regulation does not violate the statutory mandate of "true and actual" valuation, we must determine if the methodology nonetheless creates an unconstitutional inequality. Petitioners argue that by taxing its coal properties in tonnage amounts and at prices that do not reflect their actual natural resources property or the actual market value as of the assessment date and year, they are being taxed in violation of both the "equal and uniform" and equal protection provisions of the West Virginia and United States Constitutions. Petitioners argue that by over-taxing coal properties, even the *uniform* application of the mass appraisal methodology creates inequality. Petitioners rely on this language from the United States Supreme Court to explain the conceptual disparity:  "Applying the same ratio to the same assigned values, when the actual values differ, creates the same disparity in effect as applying a different ratio to actual values when the latter are the same." *Cumberland Coal Co. v. Bd. of Rev. of Tax Assessments*, 284 U.S. 23, 29 (1931).

24

The Tax Department's counter-argument is simply that its methodology is equally applied to all coal properties and therefore does not treat petitioners differently or unequally as compared to other coal property taxpayers. As for the conceptual inequality described in *Cumberland Coal*, the Tax Department argues merely that the case has been called into question because it pre-dates the "rational basis" equal protection analysis that has developed in modern jurisprudence.[22] *See Nordlinger v. Hahn*, 505 U.S. 1, 25 (1992) (Thomas, J., concurring in part) ("*Cumberland Coal*, which fails even to mention rational-basis review, conflicts with our current case law.")

"The right to equal protection of the laws is, of course, found in the Fourteenth Amendment to the Constitution of the United States." *Payne v. Gundy*, 196 W. Va. 82, 87, 468 S.E.2d 335, 340 (1996). Commensurately, "West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution." Syl. Pt. 4, *Israel by Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 388 S.E.2d 480 (1989). When an equal protection challenge is made involving economic rights, the rational relationship test is utilized:

> "'Where economic rights are concerned, we look to see whether the classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally. Where

---

[22] While this is true, this omission affects only the potential resolution of a similar challenge, *i.e.* if the *Cumberland* Court had applied a rational relationship test, would the classification have passed constitutional muster? Regardless, however, the inequality described in *Cumberland Coal* is still a well-articulated description of how even a uniformly-applied system can potentially create an equality problem.

such classification is rational and bears the requisite reasonable relationship, the statute does not violate Section 10 of Article III of the West Virginia Constitution, which is our equal protection clause.' Syllabus Point 7, [as modified,] *Atchinson v. Erwin*, [172] W.Va. [8], 302 S.E.2d 78 (1983)." Syllabus Point 4, as modified, *Hartsock-Flesher Candy Co. v. Wheeling Wholesale Grocery Co.*, 174 W.Va. 538, 328 S.E.2d 144 (1984).

Syl. Pt. 4, *Gibson v. W. Va. Dep't of Highways*, 185 W. Va. 214, 406 S.E.2d 440 (1991), *holding modified by Neal v. Marion*, 222 W. Va. 380, 664 S.E.2d 721 (2008).

Insofar as the "Equal and Uniform" Clause is concerned, this Court has treated such a challenge collectively with equal protection challenges, warning that

> [w]e must exercise considerable caution in using our equality provisions to scrutinize underinclusive challenges to tax legislation—those cases in which the taxpayer objects to his tax because some other group, even if similar, has escaped the levy. . . . Courts should venture into that thicket only with utmost trepidation and only for a very good reason.

*Appalachian Power Co.*, 195 W. Va. at 596, 466 S.E.2d at 447. The *Appalachian Power* Court found that, with respect to tax legislation, our equality provisions require only geographic and class equality and dispensed with the challenge therein by stating that "all businesses within each class [were treated] the same." *Id.*

In support of this argument, petitioners rely heavily on *Killen v. Logan County Commission,* 170 W. Va. 602, 295 S.E.2d 689 (1982), *overruled on other grounds by In re Tax Assessment of Foster Foundation's Woodlands Retirement Community*, 223 W. Va. 14, 672 S.E.2d 150 (2008). In *Killen*, the Court addressed what it termed a

26

"fractional assessment"—an assessment method that resulted in like properties being assessed at differing percentages of their market value. *Id.* at 606, 295 S.E.2d at 693. Killen (the local school board president) alleged that Logan County property values were *under-valued* because they were not consistently assessed at full value, but rather somewhere within a "range" of 50 to 100 percent of value, as permitted by statute. *Id.* at 610, 295 S.E.2d at 698.

The *Killen* Court broadly enunciated the position asserted by petitioners herein—that by rendering an inaccurate base valuation, taxpayer properties are not treated equally and therefore constitutionally required "equal and uniform" taxation cannot be obtained: "Valuation, the determination of value, constitutes realization of the tax base. Without an accurate determination of the tax base, equal and uniform taxation cannot be achieved." *Id.* at 613, 295 S.E.2d at 700. Moreover, the *Killen* Court posited that the uniform application of an inherently flawed methodology will not necessarily "cure" an inequality:

> [Appellants] interpret ["equal and uniform"] to require only *uniformity of methodology* in determining value within a county. As already demonstrated, the existing 'uniformity' of methodology has not, and cannot result in uniform taxation, either within a county or within this state. Since article 10, section 1 of the West Virginia Constitution requires equal and uniform taxation in all areas of the state, *both the method and the result of taxation are essential to compliance with the constitution*.

*Killen,* 170 W. Va. at 619, 295 S.E.2d at 707 (emphasis added). *See also Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster*, 488 U.S. 336, 346 (1989) ("Viewed in

27

isolation, the assessments for petitioners' property may fully comply with West Virginia law. But the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings.").

We agree conceptually with *Killen's* observations regarding the importance of reaching accurate base valuations and that even the uniform use of a formula against indiscriminately valued properties may create equality issues. However, we believe that *Killen* requires a more nuanced reading against the backdrop of alleged valuation inequalities which necessarily result from carefully crafted, stakeholder-involved, and legislatively-approved systems which make no facially arbitrary classifications nor allow for use of indiscriminate applications. We observe, importantly, that *Killen* makes no mention or use of the rational relationship test. Like the United States Supreme Court's reluctance to vouch for *Cumberland Coal*'s current vitality for the same reason, the absence of a rational relationship analysis alone makes *Killen's* rigid application untenable.

More importantly, *Killen* involved a variable fractional assessment, which created wildly fluctuating assessments of like properties, due to the fact that the statute at issue permitted each individual county's assessor to "vary assessments up to 50 percent of the appraised value both within and among classes of property." *Id*. at 618, 295 S.E.2d at 705. It is upon that premise that the *Killen* Court found an equality violation: "Assessment at a percentage of appraisal value, with the percentage varying from county-to-county

within and among the various classes of property, cannot achieve equal and uniform taxation." *Id*. at 613–14, 295 S.E.2d at 701. No such arbitrary variations are present here.

In the instant case, petitioners do not allege that the Tax Department is utilizing a methodology to determine their coal property's value that differs from that being used for other taxpayers or applying it in an inconsistent manner property to property. Rather, petitioners bemoan the use of seam thickness and SCPPT averages due to the purported disparity those averages reflect with their individual coal properties and market prices as of a date certain. However, to whatever extent petitioners perceive their property is being over-valued by purportedly "inflated" prices per ton and/or the seam thickness average, all other taxpayers are equally subjected to the same price per ton and seam thickness average. *Compare Matter of U. S. Steel Corp.*, 165 W. Va. 373, 379, 268 S.E.2d 128, 132 (1980) (finding unconstitutional assessor's use of "two systems of assessment, one for favored taxpayers and one for others"). As the Supreme Court stated in *Allegheny Pittsburgh Coal*, "the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." 488 U.S. at 343 (citing *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 526-27 (1959)).

Petitioners hinge their argument precariously on the isolated statement of Mr. Kern, who, in explaining the use of averages in the mass appraisal system, conceded that, as a result, "[s]ome places are getting less tax than they could, and some places are getting a little more tax than they could." However, Mr. Kern's testimony was hardly the

bombshell petitioners would suggest. Mr. Kern's testimony, in context, was not an admission to an arbitrary, discriminatory, or *ad hoc* taxation scheme. Rather, he was explaining the obvious: averages—by definition—both under- and over-represent certain of those numbers which they reflect. Accordingly, the use of a mass appraisal system that applies these averages across the board mathematically under- and over-represents certain of the values which comprise the average. This alone does not create a taxation equality problem for which the Constitution demands a remedy.

Instead, we reiterate the United States Supreme Court's observation that the equal protection clause "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation." *Allied Stores*, 358 U.S. at 526. In short, "precise, scientific uniformity with reference to composition, use or value" is neither required nor practically achievable. *Id*. at 527. Rather, "the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification"; this rule is "especially deferential in the context of classifications made by complex tax laws." *Nordlinger*, 505 U.S. at 11; *see also Revenue Cabinet, Com. of Ky., v. Gillig*, 957 S.W.2d 206, 209 (Ky. 1997) ("[S]ome amount of inequality in property taxation is inevitable.").

In the instant case, it is clear that to whatever extent inequalities are created by the mass appraisal methodology, any such inequality passes rational relationship muster. The classifications result from a well-recognized mass appraisal methodology that is

employed to ensure tax payment and revenue predictability for both the State and taxpayer and alleviate the unattainable administrative burden of annual reappraisal.  *See Appalachian Power Co.*, 195 W. Va. at 596, 466 S.E.2d at 447 (approving classifications which advance "ancillary interests" such as "administrative efficiencies"); *Calhoun Cty. Assessor v. Consol. Gas Supply Corp.*, 178 W. Va. 230, 232, 358 S.E.2d 791, 793 (1987) ("'[A]s a general rule, courts have been tolerant in construing statutes prescribing the procedure for assessments . . . [and] [t]he factor of administrative convenience in the enforcement and collection of taxes is taken into consideration by the courts.'" (quoting N. Singer, 3A Sutherland Statutory Construction § 66.06 (4th ed. 1986))).

Moreover, the methodology's design seeks to even out the extreme ends of the coal pricing curve and functions to provide commensurate benefit to the taxpayer insofar as peak market pricing occurs.[23]  Finally, the methodology is unquestionably applied uniformly across the coal property tax base.  "'If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.'" *Allegheny Pittsburgh*, 488 U.S. at 344 (quoting *Brown-Forman Co. v. Kentucky*, 217 U.S. 563, 573 (1910).

This Court has approved of the principle articulated by the Supreme Court of Ohio that

---

[23] *See* n.20 *supra*.

31

"[t]he system of taxation unfortunately will always have some inequality and nonuniformity attendant with such governmental function. It seems that perfect equality in taxation would be utopian, but yet, as a practicality, unattainable. We must satisfy ourselves with a principle of reason that practical equality is the standard to be applied in these matters, and this standard is satisfied when the tax system is free of systematic and intentional departures from this principle."

*Kline v. McCloud*, 174 W. Va. 369, 374, 326 S.E.2d 715, 720 (1984) (quoting *Meyer v. Cuyahoga Cty. Bd. of Revision*, 390 N.E.2d 796, 800 (Ohio 1979)). We therefore conclude that the valuation methodology contained in West Virginia Code of State Rules § 110-1I-1 *et seq.* for the calculation and use of an average Steam Coal Price Per Ton and average coal seam thickness does not violate the equality provision of West Virginia Constitution Article X, Section 1 or the equal protection provisions of the West Virginia and United States Constitutions.

## IV. CONCLUSION

For the foregoing reasons, we affirm the December 7, 2017, order of the Circuit Court of Marshall County, West Virginia.

Affirmed.